**UNITED STATES of America, Appellee,**

v.

**Mark BLAIR, Defendant, Appellant (Two Cases).**

**Nos. 88–1796, 89–1438.**

United States Court of Appeals, First Circuit.

Heard June 6, 1989.
Decided Sept. 29, 1989.

478

Joseph A. Dickinson, Concord, with whom Paul Twomey and Twomey & Sisti Law Offices, Chichester, were on briefs, for defendant, appellant.

Peter E. Papps, Acting U.S. Atty., was on brief, for U.S.

Before BREYER, REINHARDT,* and TORRUELLA, Circuit Judges.

TORRUELLA, Circuit Judge.

Appellant was found guilty by a jury of broadcasting false radio distress signals to a naval aircraft in violation of 18 U.S.C. § 1001 (knowingly making false statements). He appeals claiming two errors: (1) that the evidence was insufficient to sustain the conviction, and (2) that the government withheld exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). We affirm the conviction.

### I. *Sufficiency of the evidence*

The standard of appellate review on the sufficiency of evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *see United*

---

* Of the Ninth Circuit, sitting by designation.

*States v. Powell,* 469 U.S. 57, 67, 105 S.Ct. 471, 478, 83 L.Ed.2d 461 (1984); *Justices of Boston Municipal Court v. Lydon,* 466 U.S. 294, 318, 104 S.Ct. 1805, 1818, 80 L.Ed.2d 311 (1983). "[T]he evidence need not preclude every reasonable hypothesis inconsistent with guilt; and ... the jury is free to choose among varying interpretations of the evidence, as long as the interpretation they choose is reasonable." *United States v. Guerrero–Guerrero,* 776 F.2d 1071, 1075 (1st Cir.1985). Of course, the government is also entitled to the benefit of all reasonable inferences that may arise from the state of the evidence. *Dirring v. United States,* 328 F.2d 512, 515 (1st Cir.1964).

The essential elements which must be proven beyond a reasonable doubt to establish a violation of 18 U.S.C. § 1001 are: (1) that a statement was made, (2) with specific intent, (3) to falsify, (4) a matter material, (5) to agency jurisdiction. *United States v. Lange,* 528 F.2d 1280, 1287 (5th Cir.1976); *see also United States v. Race,* 632 F.2d 1114 (4th Cir.1980). *See generally United States v. Corsino,* 812 F.2d 26 (1st Cir.1987).

Viewing the record in this case pursuant to the standards to which we are bound, there is no question but that the essential elements have been proven beyond a reasonable doubt and that the conviction must be sustained. The evidence presented supporting this conclusion is as follows.

On January 8, 1988, a United States Navy aircraft flying in the vicinity of New Hampshire on a flight from Florida to Maine, received a call from the Federal Aviation Administration center in Boston to assist in the search of an airplane believed to have crashed near Laconia, New Hampshire that evening. The naval aircraft proceeded to fly towards Laconia, at which point it made radio contact with a person who identified himself as the pilot of the presumed downed aircraft.

The "downed" pilot indicated that in addition to himself there were also with him his co-pilot and two passengers who appeared not to be moving. He claimed to have lost a lot of blood and to being very cold, and stated he did not know how much longer he could take it.

In near blizzard conditions the naval pilot proceeded to fly various flight patterns and directional vectors designed to locate the transmission source and thus the "downed" aircraft. Despite those efforts, the best estimate made by the naval pilot was that the emission signals were from a "position ... very close to the Laconia area, a little bit probably to the northwest of the airport." Because of fuel shortage the air search had to be discontinued late in the evening, without the "downed" aircraft having been located. No such aircraft was ever found because the entire incident was a hoax.

While the above aerial search was taking place, another aspect of this drama was unfolding on the ground. Timothy Dinan was returning by foot to his apartment building in Laconia when he heard what appeared to be a radio transmission. As he neared the building, he saw an open window on the third floor of a darkened apartment and listened to what sounded like a conversation between pilots. He then heard an aircraft fly overhead and then a voice coming from the darkened apartment say, "I'm losing a lot of blood; I'm not sure I can stay awake very much longer."

Dinan, accompanied by several building maintenance employees went to the door of the apartment from which the voices were heard. Although they pounded on the door, no one answered. Upon going outside again Dinan noticed that the window had been closed, but that the lights of the apartment were still off.

Soon thereafter an ambulance arrived on the scene and its occupants together with Dinan and the building employees returned to the apartment in question, which was opened by the building superintendent with a master key. At this point the apartment's lights went on and defendant appeared, inquiring as to what was going on.

Upon being told that it was believed that someone was injured in the apartment, he held up his arm as if to show no injuries. Dinan recognized his voice as being the same voice that he had previously heard as saying that he was losing blood.

The following day, Dinan read a newspaper account regarding a supposed crash hoax. He contacted the Laconia police and after a preliminary investigation, a search warrant was obtained for defendant's apartment. Various items of radio equipment were found and seized. Upon being interviewed by the police, defendant asked, "How much trouble am I in for doing this?" The police officer conducting the interview, who had heard the radio broadcasts of the "downed" pilot, identified defendant's voice as the same voice as that of the "downed" pilot.

"For us to sustain the jury's determinations, we need not find a 'smoking gun'...." *United States v. Kaplan*, 832 F.2d 676, 679 (1st Cir.1987). "If enough pieces of a jigsaw puzzle fit together, the subject may be identified even though some pieces are lacking." *Dirring*, 328 F.2d at 515. Such is the present case. Although appellant points to evidence which contradicts the above, there is no question that if the jury believed the above version of the events, a result which we must conclude is reasonable, its verdict is sustainable on appeal.

## II. *The alleged Brady violation*

After conviction, defendant moved for a new trial claiming violation of *Brady v. Maryland, supra.* It is alleged that the government failed to produce a map prepared by the Navy pilot, which map contained exculpatory evidence. The argument is not entirely clear, but as best as we can piece it together it is based upon a portion of the Navy pilot's testimony in which he indicated that the location of the transmissions was "very close to the Laconia area ... to the northwest of the airport," and that he had "a navigation chart ... where [he] could draw a circle and say within this position, but we didn't—we had intermitent ground contact that I was inter-

cepting." During the investigation of this case, the pilot had told the Federal Bureau of Investigation that the location of his plane during these transmissions was within the area where defendant's apartment was found and that he felt he was "within a quarter mile of [defendant's] position, maybe less." Two maps produced by the government, *post* trial, when pieced together, allegedly showed that the signals were being transmitted from a point over two miles from the defendant's apartment. The district court denied the motion for new trial.

Defendant's reliance on *Brady* is misplaced for several reasons. First of all, it is far from clear that any map existed. In fact, from the above it would appear to us that it did not. More important, however, is the district court's findings which in effect cast substantial doubt on the issue of whether any map existed. It found that the document produced *post* trial "is a composite map made up by the Government from the testimony with respect to the degrees and directions as given" by the Navy pilot to the FBI. Of course, all of this information was in fact known to the defense, and was the subject of both direct and cross examination. But even assuming the court's findings regarding the non-existence of the map are not entitled to deference, *see Maine Moore v. Taylor*, 477 U.S. 131, 145, 106 S.Ct. 2440, 2450, 91 L.Ed.2d 110 (1986); *In re Grand Jury Proceedings United States*, 626 F.2d 1051, 1053 (1st Cir.1980), there are even more compelling reasons to reject defendant's contention.

The new trial motion should be denied unless the supposed information is of sufficient significance to result in the denial of defendant's right to a fair trial. *United States v. Agurs*, 427 U.S. 97, 108, 96 S.Ct. 2392, 2399, 49 L.Ed.2d 342 (1976); *United States v. Hemmer*, 729 F.2d 10, 14 (1st Cir.1984). That is not the situation presented by this appeal. The allegations concerning the "map" are a whole school of red herring. The district court more than adequately summarized the issue when it said: "[I]n light of the overwhelming evidence that the false transmission concerned loss of blood on the part of the purported survivor of the air crash ... were overheard by those in the Naval aircraft, by those sending on the ground, and by Mr. Dinan emanating from the window of defendant's apartment—the map, if such exists, is not of the exculpatory nature required by law to be produced such as to warrant the granting of the motion for a new trial. Otherwise stated, even if were such a map found and produced, ... it would not be sufficient to raise a reasonable doubt in light of the overwhelming evidence produced by the government."

*Affirmed.*