UNITED STATES of America, Appellee,

v.

**Victor MARTINEZ,
Defendant, Appellant.**

UNITED STATES of America, Appellee,

v.

**Hector VIDAL, Defendant, Appellant.**

UNITED STATES of America,
Appellant,

v.

**Victor MARTINEZ,
Defendant, Appellee.**

**Nos. 89–2044, 89–2045 and 89–2095.**

United States Court of Appeals,
First Circuit.

Heard Oct. 5, 1990.

Decided Jan. 9, 1991.

---

Edward J. Romano, with whom John F. Cicilline, Providence, R.I., by appointment of the Court, was on brief, for defendant-appellant Víctor Martínez.

Joel D. Landry, with whom Connors & Kilguss, Providence, R.I., was on brief for defendant-appellant Héctor Vidal.

Edwin J. Gale, Asst. U.S. Atty., with whom Lincoln C. Almond, U.S. Atty., Providence, R.I., was on brief for appellee, U.S.

Before TORRUELLA, Circuit Judge, TIMBERS,* Senior Circuit Judge, and CYR, Circuit Judge.

TORRUELLA, Circuit Judge.

These consolidated appeals stem from the conviction of appellants, Víctor Martínez and Héctor Vidal, for possessing and conspiring to possess with intent to distribute a Schedule I controlled substance in violation of 21 U.S.C. §§ 841 and 846. A federal grand jury for the District of Rhode Island indicted appellants together with co-defendants Freddy Fabián, Miguel Cabrero, and Nelson Vélez–Ortiz, but the cases of the latter two were disposed of by way of pleas and the case of the former was not appealed. Guilty verdicts in the other cases followed six days of testimony, and appeals from Martínez, Vidal, and the government followed the convictions. Finding no merit in any of appellants' contentions, we affirm.

I. BACKGROUND

Six days of trial produced an inordinate amount of evidence which, for organization purposes, we will recount in the order in which it was presented before the district court.

* Of the Second Circuit, sitting by designation.

### A. The Government's case in chief

In the Spring of 1989 officers from the Special Investigations Bureau of the Providence Police Department conducted an investigation into a suspected heroin trafficking ring which allegedly operated from the second-floor apartment of a tenement located in that city. On May 2, 1989, anticipating the execution of a warrant later that day, an agent by the name of Detective Beraducci arrived at the site at approximately 1:00 p.m. for the purpose of conducting a surveillance of the premises. The warrant was being procured by another agent, Detective Francisco Colón, on the basis of information supplied by a confidential informant who had allegedly visited the location on several occasions before that day, and had witnessed drug transactions taking place.

Detective Beraducci observed a total of four suspects in or about the premises during the course of his surveillance. Shortly after taking up his position, he witnessed a car drive up to the site. He saw the driver exit the car, walk to the front of the tenement and throw a pebble at the window of the second-floor apartment. Someone came to the window, and shortly thereafter, the driver was allowed inside the premises. After a few minutes, this individual came out of the building and returned to the car, where he appeared to be working on the inside panel of the passenger side of the automobile. That done, the car drove off. Beraducci related his observations by means of a hand-held radio to other police officers in the area as well as to Detective Colón, who was able to receive those communications while at Police Headquarters.

A few minutes later, Beraducci observed a man, subsequently identified as co-defendant Héctor Vidal, exit the premises carrying a cardboard box in his hands. He also drove away, but only to return twenty minutes later, this time carrying what appeared to be a styrofoam container of take-out food. Beraducci then saw Vidal re-enter the building.

Still stationed in his covert position a few feet away from the tenement, Beraducci next observed a male subject drive up to the site and enter through the left front door to the building. He exited a few minutes later, noticeably carrying something in the pockets of his pants. Suspecting that the individual had just obtained heroin from the apartment under surveillance, Beraducci radioed other officers in the vicinity to stop the suspect once he had driven away. Officers Gannon and Correia received Beraducci's radio request and subsequently arrested the man after a short chase. This individual, later identified as co-defendant Miguel Cabrero, a/k/a Marco García, was found to have been in possession of four packages of heroin marked with a stamp bearing the word "Demolición."

At approximately 3:25 p.m., Beraducci observed a third man arrive at the site. This individual was known to Beraducci as Josh Morillo, a previous narcotics subject. He saw Morillo enter the building and exit two or three minutes later, then drive away out of Beraducci's sight. Despite Beraducci's radio calls to stop Morillo, no one was in a position to make the stop.

By 3:45 p.m. Detective Colón had obtained a search warrant authorizing a search of the second-floor apartment and he arrived at the premises with several other officers shortly thereafter. Forcible entry was required, as no one responded to the officers' announcement of their purpose and identities. As the front door was finally opened, the sound of breaking glass could be heard from the rear of the apartment. The officers rushed inside in an attempt to locate and arrest any occupants. Proceeding from the living room through a dining area which was strewn with a considerable amount of narcotics packaging paraphernalia in open view, they found two adult males, later identified as co-defendants Victor Martínez and Nelson Vélez–Ortiz, seated on a bed in a back room off the kitchen. Martínez and Vélez–Ortiz were arrested and brought to the front room where Detective Colón retrieved a ring of keys from Martínez' person, one of which was found to open the front door to the apartment.

While the officers accompanying Colón were making these arrests, Officers DeAngelis and Beraducci had moved hastily to the back of the apartment to apprehend any suspects who might be attempting to flee. Having heard the sound of breaking glass which followed their entry, the officers had gone to the right rear corner of the apartment, whereupon as they looked up through the back window they saw a man, later identified as co-defendant Freddy Fabián, in mid-air, falling to the ground below. Fabián landed on his feet and began running immediately, a few steps behind Vidal, who had apparently utilized the same means to exit the apartment. The officers gave chase, all the while identifying themselves as police officers and ordering the suspects to stop, all to no avail. The suspects were finally apprehended and brought back to the apartment.

The balance of the evidence presented by the government established that the suspects who had allegedly jumped through the second-floor window displayed leg casts two days after their arrests, and that a rubber stamp bearing the name "Demolición," and a styrofoam food container like that observed being carried into the premises by Vidal some two hours before the raid, were seized from the apartment.

### B. Defendant Martínez' trial testimony

At trial, Martínez took the stand in his own defense. At the time of the subject offense, he claimed to have been earning a living as a taxi driver in New York. With regard to the events of May of 1989, Martínez testified that on the night of May 1 he ran into a friend by the name of Manuel Esposito at a social club in the Bronx. Esposito told him that he was going to drive to Providence later that night and invited him to come along. Martínez agreed and, without making any further preparations, departed immediately with his friend. After arriving in Providence about an hour after midnight, the two men allegedly spent the night at the house of Esposito's girlfriend. At approximately 10:00 a.m. the morning of May 2, they went for a drive around the city of Providence and eventually stopped at a restaurant just about an hour or two past noon. The stay at the restaurant lasted for about half an hour and then a short drive took them to the place of the arrests, where they arrived at or about 3:00 p.m. that afternoon. At that point Esposito told Martínez to wait in the car while he went inside the building, then came out a few minutes later accompanied by an unidentified man. The duo approached Martínez and directed him to get out of the car and wait for them there while they ran some errands. While Martínez waited for their return it began to drizzle and a man, subsequently identified as co-defendant Vélez–Ortiz, opened the upstairs window and invited Martínez to come into the apartment.

Once inside the building Martínez allegedly went to the second floor, sat on a sofa, and talked to Vélez–Ortiz, a total stranger, for about thirty minutes. He claimed that he heard no one else in the premises and that he could not see into the other rooms because folding doors closed off the remainder of the apartment. Then, all of a sudden, the police were in the building, and Vélez–Ortiz told Martínez to run because there was trouble. Martínez moved swiftly to the rear of the apartment and went into the bedroom where he was subsequently arrested.

The remainder of Martínez' testimony consisted of a series of denials of facts material to the government's case. He claimed never to have seen Fabián or Vidal before trial, never to have noticed the broken windows in the apartment, and never to have observed the narcotics paraphernalia in the dining room area through which he admits he passed on the way to the rear bedroom. Additionally he testified that the keys seized by the officers did not come from his person and did not even belong to him. Martínez likewise claimed not to have heard from his friend Esposito since seeing him drive off at about 3:00 p.m. on May 2, 1989 and never to have been in Providence prior to that day.

### C. The Government's rebuttal

In rebuttal, the government called Clayton Shackleton, a real estate developer and

the owner of the building where the arrests took place. Shackleton testified that at the time of the search the building was under construction and only the second-floor apartment was rented. He stated that by reason of the ongoing construction he visited the site virtually every day during April and May of 1989. Shackleton identified Martínez as an individual whom he had seen inside the rented apartment on approximately three occasions when appliances were either being delivered or repaired, and added that he had seen Martínez at the premises on approximately twelve to twenty other occasions.

### D. The sentencing hearing

At Martínez' sentencing hearing, the government sought a five level increase above the base offense level of 20 previously agreed upon by the parties. A three level increase was sought pursuant to Guideline § 3B1.1(b) for Martínez' managerial role in the operation, as evidenced by his frequent visits to the premises prior to the date of the search and by his possession of a key to the apartment. An additional two level increase was sought pursuant to Guideline § 3C1.1 for obstruction of justice, based on Martínez' alleged perjured testimony at trial. The sentencing court did increase the offense level by three points for Martínez' managerial role in the operation, yet declined to do the same with regard to his allegedly perjurious testimony. The increase was based on the court's finding that Martínez' possession of the key to the apartment suggested that he controlled the activities which were operated from within.

## II. ISSUES ON APPEAL

The parties to these appeals have raised seven principal questions which deserve our attention. Both Martínez and Vidal challenge the court's unwillingness to order the government's disclosure of the identity of its confidential informant. They have also taken exception to the trial court's refusal to grant their motion for severance and their motion for judgment of acquittal. Additionally, appellant Vidal assigns error in three other respects, claim-

ing that he was unfairly prejudiced by the government's cross-examination of a co-defendant who elected to testify on his own behalf, and that the district court's reluctance to impart a "missing witness" instruction, as well as its application of the sentencing guidelines, were erroneous. The government, on the other hand, has appealed on the ground that the court was wrong in not increasing appellant Martínez' base offense level based on the fact that Martínez perjured himself during the trial. We address these issues in turn.

## III. DISCUSSION
### A. The confidential informant

Both Martínez and Vidal join in arguing that they were denied their right to a fair trial by the government's refusal to disclose the identity of a confidential informant. Specifically, they contend that the government informant had witnessed most of the transactions which led to their arrests and could therefore have provided important exculpatory evidence that would have significantly corroborated the theories they presented in their defense. Martínez and Vidal additionally argue that the informant is the only witness who could have identified which of the suspects were actually involved in the drug operation and that, had the informant been called, he would have testified that he had never seen either appellant on or about the premises. The better part of reason, however, is not on their side.

The success of their argument was premised, of course, on the applicability of the so called "informant's privilege" to the facts of this case. Courts have long recognized the government's qualified privilege to disclose the identity of informants. *Roviaro v. United States*, 353 U.S. 53, 59, 77 S.Ct. 623, 627, 1 L.Ed.2d 639 (1956); *United States v. Hemmer*, 729 F.2d 10, 15 (1st Cir.), *cert. denied*, 467 U.S. 1218, 104 S.Ct. 2666, 81 L.Ed.2d 371 (1984). As *Roviaro* and its progeny make clear, however, said privilege, though well-established, is by no means absolute. In the past we have held that disclosure must be forthcoming if

"the government informant was the sole participant, other than the accused, in the transaction charged," or was "the only witness in a position to amplify or contradict the testimony of government witnesses." *United States v. Bibbey*, 735 F.2d 619, 621 (1st Cir.1984), quoting from *Roviaro*, 353 U.S. at 64, 77 S.Ct. at 629. However, when the government informant is not an actual participant or a witness to the offense, disclosure is required only in those exceptional cases where the defendant can point to some concrete circumstance that might justify overriding both the public interest in encouraging the flow of information, and the informant's private interest in his or her own safety. *Hemmer*, 729 F.2d at 15; *United States v. Estrella*, 567 F.2d 1151, 1153 (1st Cir.1977). Mere speculation as to the usefulness of the informant's testimony, it must be emphasized, is insufficient to justify disclosure of his or her identity, so defendants have an obligation to provide at least some explanation of how the informant's testimony would have supported their alleged defenses. *United States v. Giry*, 818 F.2d 120, 130 (1st Cir.1987); *Hemmer*, 729 F.2d at 15. Moreover, our cases have also established that where the informant is a mere tipster, a conduit rather than a principal or active participant in the enterprise, disclosure is not required, even in those instances where the informant was present during the commission of the offense. *Giry*, 818 F.2d at 130. In sum, we believe we fairly state the point when we say that the privilege need only give way when disclosure of the informant's identity would be vital to a fair trial.

There can be no question that the government informant was not present at the subject apartment on the day of the arrests. He was therefore not a participant, let alone the sole participant other than the accused, in the offenses charged. Moreover, since he was not a witness to the events of May 2, he was not in a position to amplify, contradict, or clear up any inconsistencies in the government witnesses' testimony or any controversies which might have arisen between the prosecution's account of the facts and the version presented in appellants' defense. Thus, as to the events of May 2, 1989, the only events which need concern us in this case, the informant was a mere tipster, making disclosure mandatory only if a showing of exceptional circumstances had been made. None was. Appellants' claim is limited to alleging that the informant could have provided important exculpatory evidence which would have corroborated the theories presented in their defense, but we were never told which facts their argument referred to or how such corroboration would have taken place. That the informant witnessed prior drug transactions in the subject apartment and could have testified that he had not seen either appellant participate in them, though possible, is only of tangential relevance at best, since the fact of the matter is that appellants were prosecuted for possessing and conspiring to possess with intent to distribute controlled substances on the sole basis of the events of May 2. Lack of presence at the premises prior to May 2 would not have given rise to an inference of non-involvement on the day of the arrests. In short, then, a fair trial did not necessitate the presence of the government informant.

### B. Motion for severance

Martínez and Vidal once again join forces to argue that their joint trial failed to meet the required standards of fairness on yet another front. This time, the trial court's refusal to grant their mid-trial motions for severance is the purported ground. Once again, their argument lacks a sufficient legal basis for success on appeal.

Martínez' cries of prejudice spring from the cross-examination of Detective Colón by counsel for Vidal and Fabián. That cross-examination resulted in testimony to the effect that Colón's informant did not provide physical descriptions of drug suspects within the subject apartment that matched either Vidal or Fabián. Trial counsel for Martínez, for whatever reasons, did not cross-examine Colón along these same lines. Under these circumstances, it is Martínez' view that the jury could but infer that Colón's informant had

described a suspect present at the apartment whose physical appearance matched Martínez'. At that point, his argument goes, the court should have granted his mid-trial motion to sever.

Vidal's thesis of prejudice runs as follows. He argues that the government's case in chief failed to establish a connection between him and the criminal activity charged in the indictment. After a motion for judgment of acquittal was argued and denied, co-defendant Martínez took the stand on his own behalf and the government, upon cross-examination, allegedly tried to elicit facts which would incriminate Vidal. The prejudice resulting from this practice, Vidal maintains, called for the trial court to order that their cases be severed.

 The decision to grant or deny a defendant's motion for severance has always been, and will continue to be, a matter committed to the sound discretion of the trial judge. *United States v. Arruda,* 715 F.2d 671, 679 (1st Cir.1983). At the trial level, defendant's burden is an exacting one: a separate trial will be ordered only upon "a strong showing of prejudice." *United States v. Porter,* 764 F.2d 1, 12 (1st Cir.1985), *cert. denied,* 481 U.S. 1048, 107 S.Ct. 2178, 95 L.Ed.2d 835 (1987); *Arruda,* 715 F.2d at 679; *see also* Fed.R.Crim.P. 14. At the appellate level, we will only interfere with the lower court's exercise of its discretion upon a demonstration of manifest abuse. *United States v. Boylan,* 898 F.2d 230, 246 (1st Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990). We add that "prejudice means more than just a better chance of acquittal at a separate trial." *United States v. Martínez,* 479 F.2d 824, 828 (1st Cir.1973). Incidental prejudice, such as that which is almost always encountered when multiple defendants playing different roles are tried together, will not suffice. *United States v. Cresta,* 825 F.2d 538, 554–55 (1st Cir.1987), *cert. denied,* 486 U.S. 1042, 108 S.Ct. 2033, 100 L.Ed.2d 618 (1988).

 Against this backdrop, concluding that neither appellant was sufficiently prejudiced by the trial court's denials of their motions for severance need not concern us for long. With regard to Martínez, his argument is a *non sequitur.* It does not follow from the fact that the informant's testimony did not place either Vidal or Fabián at the subject apartment, that the suspects that the informant did see necessarily included Martínez. There could have been, it is apparent, a number of other drug buyers. We must recall that the informant was not present at the premises on the day of the arrests, but only on previous dates, and that even on the day of the arrests, officers saw at least one other suspect who could not be apprehended. In any case, even assuming that some prejudice would have resulted, it would have been slight.

 With regard to Vidal, we have examined the record and found that the testimony he refers to could not have had the alleged prejudicial effect for two reasons. First, the trial court effectively foreclosed the prosecution's line of questioning as it referred to co-defendant Vidal. Secondly, even on the face of the prosecution's efforts to elicit from Martínez testimony which would have incriminated Vidal, Martínez' responses to the prosecution's questions were predominantly evasive and the answers that did come out tended to exculpate Vidal. Thus, the resulting prejudice, if any, was purely incidental and of no legal consequence.

## C. Motion for judgment of acquittal

At the close of the government's case and, mindful of the constrictions of the "waiver rule," *United States v. Notarantonio,* 758 F.2d 777 (1st Cir.1985), at the end of the trial, both appellants moved the lower court for a judgment of acquittal. They now renew their petition before this court.

 The standard for appellate review of a post-conviction motion for judgment of acquittal notwithstanding the verdict is not the subject of much dispute. It is, in a very real sense, identical to that employed to measure the sufficiency of the evidence supporting a guilty verdict. *United States*

v. McNatt, 813 F.2d 499, 502 (1st Cir.1987). The test is whether, taken as a whole and viewed in the light most favorable to the government, the evidence, and all legitimate inferences to be drawn therefrom, would support a rational trier of fact's finding of guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. de León Davis,* 914 F.2d 340, 342 (1st Cir.1990). The evidence need not exclude every reasonable hypothesis inconsistent with guilt, and the jury is entitled to choose among varying interpretations of the evidence so long as the interpretation it chooses is a reasonable one. *United States v. Blair,* 886 F.2d 477, 478 (1st Cir.1989); *United States v. Guerrero–Guerrero,* 776 F.2d 1071, 1075 (1st Cir. 1985), *cert. denied,* 475 U.S. 1029, 106 S.Ct. 1233, 89 L.Ed.2d 342 (1986). Briefly stated, the test is satisfied, and the verdict will stand, if any reasonable interpretation of the evidence would support the conviction. *United States v. Giorgi,* 840 F.2d 1022, 1039 (1st Cir.1988).

With respect to Martínez, we must conclude that the evidence against him was strong. In short, from the testimony presented during the six days of trial the jury rationally could have concluded not only that Martínez was on the premises several hours prior to the police raid, but that he had been associated with the activities within the apartment for the previous month. He was arrested inside the apartment, where, judging from the drug paraphernalia spread around the premises, heroin sales and packaging had evidently been taking place at the time. Perhaps most importantly, he was found in possession of a key to the apartment's front door, a particularly strong indication of his principal role in the illegal enterprise.

Turning to Vidal, we note that the evidence was not as strong. It is true that, strictly speaking, only two facts weighed against his persistent cries of innocence: he was observed leaving the premises carrying a cardboard box and returning a short time later with a food-container in his hands, and then, a couple of hours later, he

was seen running away from the crime scene a few yards in front of Fabián before the officers put them both under arrest. For their presumed exculpatory value, he clings vigorously to the facts that at no time was he physically placed inside the subject apartment by any witness and that no drugs were ever seized from him. However, life, in general, and the events of May 2, in particular, are not so simple. Testimony presented during the trial revealed that only one apartment in the tenement building was rented at the time and that the styrofoam container Vidal was seen carrying into the premises was found in the refrigerator of the subject apartment, thus permitting a reasonable jury to conclude that Vidal had in fact been inside the apartment. It must also be noted that, unlike presumed drug buyers who had to summon an occupant to open the front door and stayed only for the short period of time required to perform the transaction, Vidal proceeded inside without hesitation and was known to have been in the apartment for no less than two hours, two facts from which the jury could conclude that he was a principal member of the conspiracy on account of which he was convicted. Finally, although Vidal was not the suspect whom the officers saw jumping from the second-floor apartment window, two days after the arrests Vidal was seen wearing a cast on his leg, as was the other suspect who had been spotted in mid-air and was arrested running a few steps behind Vidal. Evidence of flight, it cannot be gainsaid, is a particularly eloquent reflection of a guilty mind. *United States v. Hernández–Bermúdez,* 857 F.2d 50, 52 (1st Cir.1988).

Both appellants contend that the government's case, even viewed in its most favorable light, did not establish more than their mere presence at the scene of the crime. While it is true that "mere presence," without more, is insufficient to prove knowing possession of narcotics, *United States v. Mehtala,* 578 F.2d 6, 9 (1st Cir.1978), it is also true that possession of contraband may be actual or constructive, and that constructive possession may be established by proving, through either

direct or circumstantial evidence, that the defendant had dominion and control over the area where the contraband was found. *United States v. Lochan,* 674 F.2d 960, 966 (1st Cir.1982). On the basis of the evidence presented, a reasonable jury could certainly and justifiably conclude that Vidal and Martínez were principal operators of a major heroin trafficking ring. Hence, we conclude that the jury's verdicts with respect to Vidal and Martínez were amply supported by the evidence.

### D. *Government's cross-examination of co-defendant*

■ Vidal parts company with Martínez to argue that he was unfairly prejudiced by the prosecution's attempt to elicit from his co-defendant testimony that incriminated him. He sets the stage thusly.

During the course of the trial, co-defendant Martínez took the stand in his own defense. Vidal, however, had elected to rest his case without offering any testimony. On cross-examination, the prosecution posed questions to Martínez regarding co-defendant Vidal, specifically asking Martínez about the condition of Vidal's leg after his alleged leap from the second-floor window. Vidal now complains that said course of action "put him in a position where he would [have had] to testify," thus jeopardizing his Fifth Amendment right not to be a witness against himself. Vidal also takes advantage of this opportunity to revisit the argument presented under his motion for severance. As to the latter point, we refer appellant to Part III B. of this opinion for guidance. As to the former, although the ground on which appellant bases his complaint is wholly unmeritorious, the point deserves some additional comments.

As we look to the record, we perceive that the prosecutor did attempt to question Martínez concerning Vidal as alleged. These inquiries clearly were beyond the scope of direct examination, however, and defense counsel promptly objected, albeit on the mistaken ground of relevancy, prompting the trial judge to effectively foreclose further inquiry into the matter.

Moreover, the court instructed the jury not only that the answers were to be disregarded, but that the jury was to disregard the questions posed as well. In any event, the testimony the jury did hear was cumulative, as several government witnesses had already testified in this regard. Under these circumstances, we find that the error was harmless. *United States v. Cresta,* 825 F.2d 538, 549–50 (1st Cir.1987) (error was harmless where followed by strong cautionary instruction). We adhere to our rule that we will presume that juries can and will follow instructions to disregard inadmissible evidence inadvertently presented. *United States v. Paiva,* 892 F.2d 148, 160 (1st Cir.1989).

### E. *"Missing witness" instruction*

Vidal would next have us hold that the district court's refusal to impart a requested "missing witness" instruction was error. He reasons that since he consistently maintained that he had never been present at the apartment where the drug transactions took place and since the confidential informant was in a unique position to identify those suspects who were present, the government's failure to produce its informant gave him a right to request an instruction that would permit the jury to infer that the informant's testimony would have been adverse to the government's position. We disagree.

A "missing witness" instruction is warranted when "the failure of a party to produce available evidence that would help decide an issue may justify an inference that the evidence would be unfavorable to the party to whom it is available or whom it would ordinarily be expected to favor." *United States v. St. Michael's Credit Union,* 880 F.2d 579, 597 (1st Cir.1989) (citing 2 C. Wright, *Federal Practice and Procedure* § 489 (1982)); *see also United States v. Ariza–Ibarra,* 651 F.2d 2, 15–16 (1st Cir.), *cert. denied,* 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981). The decision whether or not to impart the instruction is of course committed to the sound discretion of the trial court. *St. Michael's,* 880 F.2d at 597.

Given the above, we readily conclude that a "missing witness" instruction would have been improper under the circumstances of this case. Simply stated, there is no basis for concluding that the government's decision not to reveal the identity of its confidential informant was the result of any consideration other than its concern for the informant's safety and anonymity, so a contrary inference would not have been justified. Moreover, where, as here, a defendant's right to a fair trial is not jeopardized by the government's refusal to disclose its informant's identity, the exercise of that prerogative can never give rise to a negative inference suggesting that the informant's testimony would have been unfavorable. *Cf. St. Michael's*, 880 F.2d at 598 (holding that requiring a "missing witness" instruction each time the prosecution decides not to immunize a witness would constitute a substantial judicial encroachment upon prosecutorial discretion). We note that here counsel was permitted, without objection by the government or instruction by the court, to argue to the jury that it should draw a negative inference from the government's failure to produce its confidential informant. Particularly under these circumstances, we have found that any claim that the denial of a "missing witness" instruction was detrimental to the defense is significantly undercut. *Ariza–Ibarra*, 651 F.2d at 16, n. 22.

### F. Vidal's sentence

Vidal finally argues that the sentence he received was excessive. Curiously enough, he concedes that the Sentencing Guidelines apply, that the sentencing court correctly applied the guidelines to impose a sentence within the guideline range, and that his sentence was not otherwise imposed in violation of law. *See* 18 U.S.C. § 3742(a). Of course, we have repeatedly held that a decision not to depart from the guidelines is not appealable. *United States v. Pighetti*, 898 F.2d 3, 4 (1st Cir. 1990). Appellant's request, then, is for us to depart from this practice and fashion a new rule permitting appeals in cases of this nature. We decline his invitation.

### G. Martínez' sentence

The government's sole complaint is that the district court improperly imposed too low a sentence on Martínez as a result of an incorrect application of Sentencing Guideline § 3C1.1. Sentencing Guideline § 3C1.1 provides that the court shall increase a defendant's offense level if the defendant willfully impeded or obstructed the administration of justice during the investigation or prosecution of the subject offense. As a possible basis for applying this adjustment, the Application Notes list defendant's untruthful testimony concerning a material fact during trial. *United States v. Sánchez–Solís*, 882 F.2d 693, 698 (2d Cir.1989). The government argues that since the sentencing court increased Martínez' offense level for his managerial role in the operation based on its finding that Martínez was in possession of a key to the apartment, it necessarily follows that Martínez' denial of the keys' ownership at trial constituted perjury, thus mandating the further increase. Additionally, it contends that the jury's finding of guilt beyond a reasonable doubt further evidences appellant's perjury, since his version of the facts was in almost total conflict with the testimony of the witnesses presented by the government.

On appeal, a sentencing court's application of the Sentencing Guidelines is entitled to considerable deference. *United States v. Trinidad de la Rosa*, 916 F.2d 27, 31 (1st Cir.1990); *United States v. Bradley*, 917 F.2d 601, 605 (1st Cir.1990); 18 U.S.C. § 3742(e). Due deference in this context means that, absent mistake of law, we will review the sentencing court's fact-based application of the guidelines only for clear error. *Trinidad de la Rosa*, 916 F.2d at 29; *United States v. Díaz–Villafañe*, 874 F.2d 43, 48 (1st Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989). Moreover, "where there is more than one plausible view of the circumstances, a sentencing court's choice among supportable alternatives cannot be clearly erroneous." *United States v. Ruiz*, 905 F.2d 499, 508 (1st Cir.1990).

In what pertains to the government's first contention, we are of the opinion that the fact that a sentencing judge bases his or her decision to increase a defendant's offense level on a fact which the defendant's own testimony negated during trial need not necessarily constrain the court to raise the level of the offense on the basis of perjury. A number of other factors, which the sentencing judge could best get a feel for, and which this court is particularly ill-positioned to evaluate, undoubtedly formed part of the equation. *Cf. Díaz–Villafañe*, 874 F.2d at 49–50. The record reveals that the sentencing judge painstakingly evaluated the circumstances surrounding Martínez' case before imposing his sentence and was clearly troubled by the fact that there had been inconsistencies in both the government witnesses' and Martínez' testimony. Under these circumstances, we refuse to adopt a mechanistic approach to sentencing whereby decisions a sentencing judge has to make regarding certain matters handcuff him or her with respect to decisions he or she has to make regarding others. The sentencing court's decision, not being clearly erroneous and deserving of deference from this court, will be allowed to stand.

As for the government's second assertion, we note that to hold that a jury's verdict of guilty beyond a reasonable doubt on the basis of evidence which was in direct conflict with a defendant's testimony signals perjury would in effect amount to punishing a defendant for exercising his right to take the witness stand in his own defense. *Cf. United States v. Mazzaferro*, 865 F.2d 450, 458 (1st Cir.1989) ("One of the fundamental principles of our jurisprudence is that a defendant cannot be punished for exercising a constitutional right and that vindictiveness is to play no role in the sentencing of defendants."). If the government concludes that there was perjured testimony in this trial, it needs no advice from us as to the appropriate steps to be taken.

## IV. CONCLUSION

Having scrutinized the record of a decidedly eventful trial, we have found that appellants have been fairly tried, justly convicted, and properly sentenced. These appeals are therefore

*Affirmed.*