U.S. v. Tzimopoulos                    CR.95-01-JD    08/30/95
                   UNITED STATES DISTRICT COURT FOR THE
                        DISTRICT OF NEW HAMPSHIRE

United States of America

        v.                                Criminal No. 95-01-03-JD

Georgia Tzimopoulos, et al.


                           O R D E R


     Currently before the court is defendant Georgia

Tzimopoulos's motion to suppress (document no. 72) all evidence

seized at her residence when law enforcement officers executed a

search warrant issued by a New Hampshire state court judge.  For

the following reasons the motion is denied.


                          Background

     On December 9, 1994, the New Hampshire State Police ("NHSP")

obtained a warrant authorizing the search of the residence of

defendants Tzimopoulos and Paul Loukedes, located at 14A Pheasant

Run, Pembroke, NH.  The affiant, Corporal Michael H. Hambrook,

stated the following to establish probable cause to believe that

evidence of a crime in violation of N.H. Rev. Stat. Ann. § 318-

B:2 would be found in the possession of Loukedes and Tzimopoulos

at their residence in Pembroke, New Hampshire.

     On May 11, 1992, Loukedes was arrested by the Phoenix,

Arizona Police Department and charged with importation of

marijuana. At the time of his arrest Loukedes had on his person $11,600 in cash and a small amount of marijuana. Loukedes had just arrived on an airplane from Boston and was traveling under the alias name of Rob Anderson.

On May 19, 1994, David and Debbie Carreau of Goffstown, New Hampshire, were shot and killed in their home. The double homicide was investigated by the NHSP and Goffstown Police Department. According to investigative reports prepared by troopers assigned to the State Police Major Crimes Unit, David Carreau was a marijuana dealer who was being supplied his marijuana by Paul Loukedes. In addition to these reports, a rolodex found at the Carreau residence listed the numerous telephone numbers of Loukedes and Tzimopoulos, who is known to be Loukedes' girlfriend.

On April 7, 1994, and again on several other occasions, Hambrook interviewed a confidential informant ("CI1"), acquainted with Loukedes and known to be reliable. According to CI1, Loukedes is a major marijuana dealer whose drug sources are located in Arizona and California. CI1 had purchased marijuana from Loukedes and believed Tzimopoulos to be involved in Loukedes' drug business, possibly receiving a percentage of the profits. CI1 said Loukedes has a nickname of "LL," which stands for "Lots of Lies" and a beeper number of 771-0155. CI1 further

2

stated that Loukedes lost a load of marijuana at an airport in New York City when a runner named Aaron Goodwin was arrested with approximately fifty pounds of marijuana flown into New York from California. Loukedes and Tzimopoulos were at the airport to meet Goodwin at the time Goodwin was arrested.

Criminal reports from The New York Port Authority show that Goodwin was arrested on January 4, 1994, at the JFK Airport in New York with approximately fifty pounds of marijuana.

On February 8, 1994, NHSP Trooper Chris Scott arrested Loukedes on route I-93 in Campton, New Hampshire, for possessing a small quantity of marijuana. Loukedes was later convicted of this offense.

On May 4, 1994, Hambrook sent CI1 to meet with Loukedes. CI1 was searched and his vehicle checked to ensure he did not have any drugs or money. CI1 was followed and observed meeting with Loukedes, Tzimopoulos and Chris McGuire. After the meeting, CI1 gave Hambrook a small sample of marijuana given to him by Loukedes.

NHSP Sergeant James Noyes met with CI1 on August 2, 1994, and checked him and his vehicle for drugs and money. CI1 was then sent to a meeting with Loukedes and McGuire. After the meeting, CI1 gave Noyes a substance represented as a small amount

of marijuana received from Loukedes.  The substance was later analyzed and found to contain .073 grams of marijuana.

On December 1, 1994, Hambrook met with a second confidential informant ("CI2").  CI2 gave extensive information concerning drug activities in the Manchester, New Hampshire, area.  The information provided by CI2 was corroborated by independent sources such as informant statements, police reports and personal investigation, thereby assuring CI2's credibility.  CI2 told Hambrook that he had known Loukedes for years and had done dozens of marijuana deals with Loukedes in the past.  CI2 indicated that he both bought marijuana from and sold to Loukedes.  CI2 stated that Loukedes was a major marijuana dealer with sources in California, that Tzimopoulos was his girlfriend, and that Tzimopoulos was involved in Loukedes' marijuana business, receiving a percentage of the profits derived from the trade. CI2 told Hambrook that Loukedes recently moved to a town near Bear Brook State Park, that his telephone was listed under the name Matt Richardson and that the first three digits of his phone number are 485.  CI2 said that Loukedes moved due to recent police activity in the Manchester area.

On November 2, 1994, Hambrook spoke with NHSP Corporal Susan Forey.  Forey stated that on November 1, 1994, she and Agent Gerry Graffam of the United States Drug Enforcement

4

Administration conducted an interview with a confidential informant ("CI3"). CI3 is known to be a reliable informant, who has provided information leading to the execution of numerous successful searches and indictments. CI3 told Forey that for a four-week period during the summer of 1994 he accompanied Robert Leonard on numerous marijuana deliveries. According to CI3, in August 1994, he was asked by Leonard and Loukedes to accompany them to Florida to "rip off," i.e., take drugs or money from, another dealer. On the day he was scheduled to leave for Florida with Leonard and Loukedes he was told to meet Leonard at his storage bin located at a Manchester, New Hampshire facility. While there, an unidentified male ("UM") arrived and an argument ensued. The UM accused Leonard of being at the facility to "rip him off." Leonard responded that he was not going to rip off the UM, that he had his own bin for storage of drugs. At this time Leonard opened a suitcase and showed the UM twelve pounds of marijuana. The UM threatened Leonard with bodily harm if he "ripped him off." CI3 noticed that the UM was carrying a gun holster. After the UM left, Leonard asked CI3 to put the suitcase in CI3's storage bin to prevent the UM from stealing from Leonard.

On November 22, 1994, Hambrook spoke with CI3, who told Hambrook that he did accompany Leonard and Loukedes to Florida in

late August 1994.  According to CI3, upon arrival in Florida he was left in a hotel room with a large sum of money while Leonard and Loukedes attended an arranged meeting.  CI3 then stole Leonard and Loukedes' money and returned to Manchester, New Hampshire, via commercial flight.  Once landed, he proceeded directly to the Manchester storage facility and retrieved the twelve pounds of marijuana.  While at the storage unit, he was beeped by Leonard on his digital pager.  CI3 called Leonard, who informed CI3 that if he returned the money, Leonard and Loukedes would forget the entire episode.  CI3 did not return the money or the drugs.

Under Hambrook's direction, CI3 paged Leonard.  Leonard returned the call and CI3 informed him that the money and drugs were being stored at a locker facility in Massachusetts.  CI3 went on to explain that because he lost all his identification, he could not enter the locker.  CI3 stated he would obtain a new ID in seven to ten days, at which time he would retrieve the money and drugs for Leonard.  Leonard told CI3 that "Paul" had "nineteen in the pile" (meaning nineteen pounds of marijuana) and that they wanted all the marijuana returned.  CI3 then informed Leonard that CI3 has a customer at the University of New Hampshire ("UNH") that could deal twenty pounds of marijuana per week.  Leonard instructed CI3 speak with his customer.

Approximately twenty minutes after the first call, CI3 again paged Leonard.  A short time later Leonard returned the call and CI3 told him that the customer from UNH wished to buy two pounds to check the quality of the product.  Leonard stated that he would be in touch.

Later in the day, CI3 again paged Leonard.  A short time later, Leonard returned the call.  Leonard told CI3 that "Paul" was willing to accept the money but was not interested in making a deal.  Leonard noted that both he and Loukedes had been forced to move as a result of CI3's action.  Leonard told CI3 that Loukedes blamed Leonard for introducing CI3 to the operation.  Leonard further informed CI3 that "Georgia" suspected CI3 of cooperating with authorities and that Loukedes had paid for Leonard to move to a new house.  Leonard indicated that if he worked alone he would deal with CI3, but because he worked with Loukedes, there could be no relationship.

On December 6, 1994, under the direction of Sergeant Brain Hester, CI3 paged Leonard.  CI3 told Leonard he was going to his storage unit to retrieve the drugs he owed to Leonard and Loukedes.  Leonard said the drugs were half his and half Paul Loukedes'.  Leonard told CI3 that he was bringing Billy Spinner with him to "make sure there is no funny business."  CI3 said he would page Leonard when he had the drugs with him.

Later that day, law enforcement officials arranged to rent a room at the Manchester Travelodge. The room was wired with a hidden microphone and conversations taped with permission from the New Hampshire Attorney General's Office. CI3 was provided fourteen pounds of marijuana to give to Leonard. CI3 paged Leonard on his digital pager. CI3 informed Leonard that he had his fourteen pounds and told Leonard where he was located. Leonard told CI3 that he would be there in about one hour.

Leonard arrived shortly thereafter and opened the bag containing the marijuana. Leonard asked about the packaging of the drugs and discussed the possibility of future deals. Leonard stated that Paul Loukedes had gone out West to pick up 250 pounds of marijuana and that he was "driving" this load back to New Hampshire for somebody else.

At approximately 5:10 p.m., Leonard left carrying the bag containing the fourteen pounds of marijuana. Leonard was then arrested by members of the NHSP and the Manchester Police Department. A subsequent search of Leonard's residence revealed a personal phone list. Under the entry "LL," Loukedes' nickname, were the two numbers noted by CI1 as Loukedes. Also under this entry was Loukedes' beeper number. The numbers were found to be listed to a Matthew Richardson, the name CI2 stated Loukedes was using to list his telephone service.

8

In his affidavit, Hambrook also set forth his training and experience and stated that based upon such training and experience, certain records, documents, weapons and other evidence would be found at the residence of Loukedes and Tzimopoulos.

## Discussion

Tzimopoulos argues the warrant is flawed because Hambrook's affidavit provides little specific information regarding any alleged drug activities in which she participates. Motion to Suppress, ¶ 8. According to Tzimopoulos, "very little detail is provided in the Hambrook Affidavit to demonstrate a `substantial basis' for finding a probable cause as to the alleged drug activities of . . . Tzimopoulos." Id. at ¶ 11.

A state search warrant resulting in a federal prosecution is evaluated under federal law. United States v. Soule, 908 F.2d 1032, 1038-39 (1st Cir. 1990). "`"The products of a search conducted under the authority of a validly issued state warrant are lawfully obtained for federal prosecutorial purposes if that warrant [1] satisfies constitutional requirements and [2] does not contravene any Rule-embodied policy designed to protect the integrity of the federal courts or to govern the conduct of

9

federal officers."'"  Id. (quoting United States v. Mitro, 880 F.2d 1480 (1st Cir. 1989)).[1]

"Constitutional requirements are satisfied so long as there was probable cause to support the issuance of the warrant."  Id. at 1093.  The court applies the totality of the circumstances test set forth in Illinois v. Gates, 462 U.S. 213, 230 (1983), which provides that probable cause cannot be determined by rigid rules and fixed standards.  Id. (citing United States v. Caggiano, 899 F.2d 99, 102 (1st Cir. 1990)).  Under Gates, the judicial officer responsible for issuing the warrant must determine only that the totality of the circumstances set forth in the application for the warrant indicates a fair probability that a search would uncover contraband or evidence of a crime at a particular place.  United States v. Burke, 999 F.2d 596, 598 (1st Cir. 1993); United States v. Diaz, 841 F.2d 1, 3 (1st Cir. 1988).  Totality of the circumstances includes veracity and the basis of knowledge of persons supplying hearsay information.  Burke, 999 F.2d at 598.  The duty of the reviewing court is to verify that the issuing officer had a substantial basis for concluding that probable cause existed.  Soule, 908 F.2d at 1039; Caggiano, 899 F.2d at 102.

---

[1]The defendant has not directed the court to any rule-embodied policy violated by the issuance of the warrant.

10

Based on the accounts of the various informants, the Hambrook affidavit provided sufficient evidence that there existed a fair probability that evidence of a crime would be found at the Loukedes/Tzimopoulos residence. The affidavit also contains ample information regarding the credibility of key informants from which the issuing judge could conclude that probable cause existed .

The affidavit revealed that the various law enforcement agencies received direct communications from participants regarding Loukedes' involvement in the sale of contraband. Known buyers were found to posses Loukedes' and Tzimopoulos's address and phone number, despite the aliases under which each was maintained. Although the information was received from various sources, it remained consistent. The specificity and details included in these accounts provided credibility to the informants. See Caggiano, 899 F.2d at 102 n.2. The reliability of the accounts was heightened since many of the accounts were based on personal observation. See Burke, 999 F.2d at 598. In addition, the credibility of CI3 was significantly enhanced by the police's independent corroboration. Id. at 599. Likewise, the affidavit provided a sufficient basis for the issuing judge to credit CI3's basis of knowledge. Finally, the issuing judge

11

was also entitled to note that certain informants had proven reliable in the past.  See id.; Soule, 908 F.2d at 1039.

Furthermore, "the affidavit was prepared by a police officer whose experience and expertise provided [the state judge] with further reason to credit the representation in the warrant that [evidence] would be found at [the residence.]"  See Soule, 908 F.2d at 1040.  The issuing judicial officer is entitled to rely upon the conclusions of experienced law enforcement officers regarding the location where evidence is likely to be found.  Id. Thus, there was sufficient probable cause to support the issuance of a warrant to search the premises at 14A Pheasant Run, Pembroke, New Hampshire.  It is of no moment that the affidavit is substantially more focused on the activities of Loukedes than those of Tzimopoulos.  As noted supra, it is required that there be probable cause to believe evidence will be found at the place to be searched.  Whether the person who owns the premises or who lives at the premises is involved in the alleged crime is immaterial to the constitutionality of any search.[2]

Moreover, even if the court were to find that the search warrant was not supported by probable cause, the evidence seized would still be admissible under United States v. Leon, 468 U.S.

---

[2]Counsel has apparently confused the probable cause standard for a search and the probable cause standard for an arrest.

897, 922-24 (1984). In <u>Leon</u> the Supreme Court held that evidence need not be suppressed even if a search warrant is subsequently invalidated as long as the officers acted with objectively good-faith reliance on the warrant. <u>Id.</u> (suppression is appropriate only if warrant is completely lacking in indicia of probable cause). The affidavit appears to the court to establish adequate probable cause. An officer is not required to apply a more stringent standard than that of the reviewing court. See <u>id.</u>; <u>Diaz</u>, 841 F.2d at 5.

Tzimopoulos also argues that three jet skis and two trailers were illegally seized "because they were not listed among the category of items stated in the warrant." Motion to Suppress at ¶ 17. The warrant provides that among items to be seized are

<u>ITEMS WHICH ARE DRUG PROFITS OR EVIDENCE OF DRUG TRAFFICKING PROCEEDS OR TO BE USED TO OBTAIN DRUGS</u> United States or foreign currency or coins, jewelry, gems, precious metals, antiques, art works, stocks and bonds, and certificates of deposit.

Defendant's Exhibit 1. It is well established that evidence of unexplained wealth is relevant in proving that a defendant was involved in drug trafficking. <u>See, e.g.</u>, <u>United States v. Ford</u>, 22 F.3d 374 (1st Cir.), <u>cert. denied</u>, 115 S. Ct. 257 (1994); <u>United States v. Figueroa</u>, 976 F.2d 1446, 1454 (1st Cir. 1992), <u>cert. denied</u>, 113 S. Ct. 1346 (1993); <u>United States v. Geer</u>, 923 F.2d 892, 896 (1st Cir. 1991). The complained of items are

13

evidence of unexplained wealth and thus included within the description of items to be seized.

## Conclusion

The motion to suppress (document no. 72) based on deficiencies in the affidavit supporting the warrant is denied.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

August 30, 1995

cc:  Steven G. Shadallah, Esquire
     Matthew J. Lahey, Esquire
     George H. Ostler, Esquire
     U.S. Attorney
     U.S. Probation
     U.S. Marshal

14