**UNITED STATES of America,
Appellant,**

v.

**Leoncio L. DIAZ, a/k/a Leonel Diaz,
et al., Defendants, Appellees.**

No. 87–1341.

United States Court of Appeals,
First Circuit.

Heard Oct. 9, 1987.

Decided Feb. 29, 1988.
Rehearing En Banc Denied
April 28, 1988.

**2**

Kathleen A. Felton, Dept. of Justice, Washington, D.C., with whom Daniel F. Lopez–Romo, U.S. Atty., and Juan A. Pedrosa, Asst. U.S. Atty., Hato Rey, P.R., were on brief, for appellant.

Harry Anduze–Montano with whom Jose R. Ortiz–Velez Santurce, P.R., was on brief, for defendants-appellees.

Elisa Bobonis Lang and John M. Garcia Law Offices, Hato Rey, P.R., on brief, for defendant, appellee Jorge L. Cabrera.

Before CAMPBELL, Chief Judge, TORRUELLA and SELYA, Circuit Judges.

TORRUELLA, Circuit Judge.

The government appeals from an order requiring suppression of all documentary evidence seized pursuant to a search warrant at Isla Rica Sales, Inc. (IRSI). The documents were seized during an investigation concerning bribery of a public official and mail and wire fraud (18 U.S.C. §§ 201, 1341 and 1343, respectively).

María Novoa, an employee of IRSI, contacted FBI special agent Coffey, to tell him about an alleged scheme to defraud insurance companies. According to María and her husband, Eloy (also an employee there), IRSI, a produce wholesaler, was bribing at least one United States Department of Agriculture (USDA) inspector, defendant Alfredo Matos. Matos would sign USDA forms falsely condemning fruits and vegetables imported by IRSI, and in some instances sign forms certifying that they had been dumped. Defendants Leoncio and Marta Díaz, and Jorge Cabrera would then sell the produce and yet claim it as a total or partial loss from various insurers.

As an example, Eloy Novoa produced a "lot" folder, containing information tracking the destiny of the contents of a trailer full of produce. That file purportedly showed that, out of a total of 750 cartons of lettuce, 282 had been certified as dumped by defendant Matos, and yet a full 743 had been sold.

The defendants allegedly used a cash box with proceeds from these double sales to pay off Matos and several of their employees who were a part of the scheme. The Novoas showed Coffey cash tickets reflecting disbursements from this cash box to a "Matos, Inspector" on February 1, 1984, and April 26, 1984. FBI special agent Coffey included all this information in an affidavit and obtained a search warrant from a magistrate authorizing him to search for and seize the following business records:

1. Certain books and records of Isla Rica Sales, Inc., since February 1, 1983, to the present, evidencing a violation of Title 18, U.S. Code, Sections 1343, 201 and/or 1341, to include:

A. All records pertaining to purchases, including, but not limited to, shipping invoices, correspondence regarding claims for damage or loss, inspection reports and dump certificates;

B. All sales records, including, but not limited to, sales control sheets (listing sales by customer, product, lot); or "conduces"; invoices, sales tickets or receipts;

C. All documents pertaining to claims or notice of damage or loss to any product;

D. All cash tickets, vouchers, disbursement records, and supporting documentation and accounting records of any type associated with any type of cash funds maintained by Isla Rica Sales, Inc., or its principals, including, but not limited to the petty cash fund;

E. All bank account records, including, but not limited to, bank statements, cancelled checks, check registers, check vouchers or deposit tickets associated with any checking or savings account maintained by Isla Rica Sales, Inc.;

F. All accounts payable records, including correspondence, ledgers, invoices and other documents pertaining to past or present accounts payable; and,

G. The cash receipts journal.

The FBI executed the warrant on June 7, 1984, and seized about 37 cartons and file folders of documents. According to the government, the documents seized did not include any current lot folders, current claims records, any organizational records, tax records, loan records, payroll records, personnel records, or computer records. The agents apparently did take all other records generated by IRSI since it began operations in February of 1983. The affidavit did not, however, specifically state that the fraud had been carried out since IRSI's inception, although Coffey later stated that the Novoas had told him exactly that.

After the search and seizure, the defendants were charged with wire fraud and bribery. Leoncio and Marta Díaz, Jorge Cabrera, and Alfredo Matos all filed motions to suppress the evidence, claiming that the warrant lacked sufficient particularity. The magistrate recommended suppression of the evidence. The government opposed the magistrate's report and recommendation, and the district court, after a hearing, granted the motions as to the Díaz couple and Cabrera. Matos was found to have no standing to raise the issue.

The district court, 656 F.Supp. 271, found that the warrant lacked both sufficient particularity and probable cause and refused to apply the good faith exception to the exclusionary rule. The government argues that the district court erred on both of these counts, and, in the alternative, that it should have applied the exception, or ordered a partial suppression only, since it expressly found probable cause as to some of the evidence seized. We will address each issue in turn.

The Fourth Amendment imposes strict requirements that must be met before a warrant may issue, in order to protect individuals from intrusive government searches pursuant to general warrants:

"no warrant shall issue, but on probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized." U.S. Const. amend. IV. As the Supreme Court described probable cause, however, "so long as the magistrate had a 'substantial basis for ... conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983) (quoting *Jones v. United States*, 362 U.S. 257, 271, 80 S.Ct. 725, 736, 4 L.Ed.2d 697 (1960)). More specifically, "two conclusions necessary to the issuance of the warrant must be supported by substantial evidence: that the items sought are in fact seizable by virtue of being connected with criminal activity, and that the items will be found in the place to be searched." 1 W. LaFave & J. Israel, *Criminal Procedure* § 3.3, pp. 184–85 (1984) (quoting, Comment, 28 U.Chi.L.Rev. 664, 687 (1961)).

The second of these conclusions is not at issue in this case; the problem, rather, lies with the first one. The items sought to be seized, as listed in the warrant, encompass nearly all the business records of IRSI. There is, however, no allegation made of fraud so pervasive as to infect every purchase and sale made by IRSI. The district court, in fact, broke down the records at IRSI into distinct categories for which there was reason to believe a connection with criminal acts existed; it found, for example, that documents involving Matos could properly be seized. We are not convinced that this is the proper approach.

■ We recognize, despite the government's arguments to the contrary, that there is insufficient information in the affidavit to implicate any USDA inspector other than Matos. The affidavit states only that other inspectors sometimes accompanied Matos on his inspections. This does not provide probable cause to believe these other inspectors were also taking bribes, even under the unexacting standard of *Illinois v. Gates, supra.*

■ We do not believe, however, that it is possible in this case to isolate specific categories such as "documents relating to lots inspected by Matos." The FBI plainly had more than enough reason to believe that IRSI was engaged in ongoing fraud. If sales slips were segregated by lot (*and* assuming they were accurately kept), then comparing purchase, dumping, and sales numbers only for those lots which Matos inspected would evidence that fraud. Since sales slips were not segregated by lot, it seems obvious that mere partial knowledge of what was purchased (*e.g.,* only those lots inspected by Matos) would be insufficient to show that the defendants sold some of what they claimed was lost. To prove the fraud, rather, the government had to demonstrate that the *total* sales plus the *total* of claimed losses of a certain produce exceeded the *total* amount purchased of that item. Only that discrepancy would show that there was a fraudulent double recovery.

It may be argued, however, that the lot files would show all that had happened to a particular lot, and would therefore be sufficient to show the fraud. If this were so, the agents could have limited their search to files for lots which had been inspected and condemned, in whole or in part, by Matos. It is true that the informants managed to find one lot file that alone was strong evidence of fraud; but the affidavit does not state, and there is no reason to believe, that all of the lot files would accurately record the extent of the fraud. Indeed, it would be the height of folly to include, in the same file, an accurate account of what was sold, and a record of a fraudulent claim of loss. The fact that one of these files contained exactly that, does not preclude the conclusion that the rest of the records (outside the lot files) would contain additional evidence of fraud.

Considering all the categories of documents as described in the warrant, we conclude: the seizure of "all records pertaining to purchases," "all sales records,"

and "all documents pertaining to claims or notice of damage or loss to any product," was warranted as likely to produce evidence of criminal activity. The accounts payable records would also indicate the amounts purchased of different types of produce. Similarly, all cash tickets and records of cash funds are relevant because the government believed that IRSI was paying off Matos and certain employees from the cash funds it maintained on the premises, and was depositing cash proceeds of the fraud into these funds. Finally, the cash receipts journal is relevant since the affidavit states that "produce claimed as damaged are sold for cash."

■ A problem remains as to one of the categories listed, however. There is nothing in the affidavit to imply that any evidence of crime could be gleaned from "all bank account records." In fact, the affidavit seems to establish that the fraudulent transactions were all cash transactions, presumably to minimize the risk of discovery.[1]

■ Under our decision in *United States v. Riggs,* 690 F.2d 298 (1st Cir.1982), we may order suppression of only the evidence seized without probable cause, while allowing use of the rest. This is an especially appropriate measure in this case where the bulk of the warrant and records seized are fully supported by probable cause. We need not invalidate the entire warrant simply because a portion of it impermissibly allows seizure of certain items. We find, therefore, that only the suppression of bank account records is required by the fourth amendment.

More troubling is the fact that the warrant included permission to seize records between February 1, 1983, when IRSI first commenced operations, and October 5, 1983, when the first instance of wrongdoing mentioned in the affidavit occurred. The government argues that the affidavit provided the magistrate with "substantial

---

1. Since there is a complete lack of justification for the seizure of these documents in view of Special Agent Coffey's own description of the scheme, we find that the good faith exception to the exclusionary rule, set forth in *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) and discussed more fully below, is inapplicable here.

basis," *see Massachusetts v. Upton*, 466 U.S. 727, 732–33, 104 S.Ct. 2085, 2087–88, 80 L.Ed.2d 721 (1984), to conclude that there was probable cause to believe the fraud was ongoing, and had not simply begun on October 5. It argues that the affidavit describes a fraudulent scheme of some complexity, with a fairly elaborate infrastructure, and a scheme that had generated substantial profits. The fact that specific documents suggesting improprieties dated October 5 and 10, 1983, and February 1 and April 26, 1984, were included as corroborative examples, should not defeat such a finding, appellants argue.

Appellees respond that the affidavit does not state the belief that the scheme enjoyed such a permanent status. They argue that the magistrate did not even know how long the Novoas had worked for IRSI, or that the Novoas had told Coffey that the fraud started as soon as IRSI opened for business. All the magistrate had before him was a description of the fraudulent scheme and evidence that fraud may have taken place as far back as October 5, 1983. Nothing in the affidavit is at all inconsistent with an October starting date for the fraud.

■ We find that the government should have advised the magistrate of its belief regarding the duration of the suspected scheme, and the basis for that belief. This would have allowed the magistrate to reach a reasoned decision as to the first date on which there is probable cause to believe that evidence of criminal acts was recorded in IRSI's business records. *See In re Lafayette Academy*, 610 F.2d 1, 6 (1st Cir. 1979) (where affidavit does not indicate any nexus between earlier documents and criminal behavior, seizure of those documents is improper). In essence, then, the warrant describes and allows, within each category, the seizure of documents as to which there is no probable cause, as well as documents that were properly seizable.

The problem could also be characterized as one of lack of particularity. *Compare, United States v. Hershenow*, 680 F.2d 847, 852 (1st Cir.1982) ("Because the affidavit establishes probable cause to seize all accident patient files, the warrant, which is confined to seizure of those materials, is sufficiently particular."). Chief Judge Campbell once said, "[t]he trouble with a generic description is that it does not direct the officer which articles to select for seizure from the described, generally inoffensive class." *United States v. Klein*, 565 F.2d 183, 190 (1st Cir.1977) (Campbell, C.J., dissenting). Similarly, here, nothing in the warrant guides the executing officer in seizing only those documents for which probable cause existed (*i.e.*, those covering a period of time during which fraud likely was ongoing).[2]

■ Before applying the exclusionary rule, however, we must determine whether the agents were acting in objective good faith. "In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Leon*, 468 U.S. 897, 926, 104 S.Ct. 3405, 3422, 82 L.Ed.2d 677 (1984). A court must inquire into the "objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922, n. 23, 104 S.Ct. at 3420, n. 23. The Court explained that "a warrant may be so facially deficient—*i.e.*, in failing to particularize ... the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id.* at 923, 104 S.Ct. at 3421.

In this case, the district court found that since there was no proof in the affidavit of illicit activity occurring before October 5, 1983, no experienced FBI agent could reasonably believe that the warrant was limit-

---

**2.** In light of our subsequent discussion, we need not determine whether partial suppression is an appropriate remedy where the lack of probable cause or particularity infects every category of documents named in the warrant. Several cases suggest that it is not. *See, e.g., United States v. Cardwell*, 680 F.2d 75, 78–79 (9th Cir. 1982); *In re Lafayette Academy*, 610 F.2d at 6.

ed to properly seizable documents. We note, however, that Coffey attempted to ensure that the search was conducted properly. He prepared an affidavit which was duly approved by a magistrate. He conducted four interviews with two witnesses in order to glean all the necessary information. The Novoas, in fact, had told the agent that the fraud had been in motion since IRSI was founded. He was entitled to believe, as the magistrate implicitly found, that he had set forth enough information in the affidavit to support the search he wished to conduct. The complexity of the fraudulent scheme, its description as an ongoing enterprise bolstered by evidence that illegal activity had continued for at least seven months, and the agent's reasonable belief that the fraud had begun already at IRSI's inception, all demonstrate that a reasonably well trained officer would not necessarily have known that the search was illegal. *Leon,* 468 U.S. at 922, n. 23, 104 S.Ct. at 3420, n. 23. *Compare Massachusetts v. Sheppard,* 468 U.S. 981, 989 n. 6, 104 S.Ct. 3424, 3428 n. 6, 82 L.Ed.2d 737 (1984) (focusing on the officer's knowledge and course of conduct in determining the reasonability of his good faith). Suppression of all the evidence seized is not, therefore, mandated.

We realize that this is a close case, but as Chief Judge Campbell has pointed out, *United States v. Abrams,* 615 F.2d 541 (1st Cir.1980) (Campbell, C.J., concurring), seizing business records in a fraud investigation presents special problems for investigators attempting to draft warrants. Especially difficult is the case where the files contain a mixture of "bad" material (supported by probable cause) and "innocent" material. *Id.* In a case such as this one, where it is virtually impossible to limit the scope of the warrant any further, a closer judgment call arises as to the acceptability of broader warrants than in cases where the documents can more easily be sub-classified. *Compare, e.g., United States v. Roche,* 614 F.2d 6, 7 (1st Cir.1980) (could have limited search to documents and records pertaining to *automobile* insurance); *Lafayette Academy, supra,* (could have limited search to evidence of fraud on

only one government program). We must also recognize that the inherent difficulty in segregating "good" from "bad" records, and consequently in drawing up an adequately limited warrant, makes it difficult for even a "reasonably well-trained officer," who is not expected to be a legal technician and is entitled to rely on the greater sophistication of the magistrate— to know precisely where to draw the line.

To summarize: we hold that the affidavit failed to provide probable cause to seize the documents described in category E of the warrant, *ante,* and that all bank account records seized pursuant to this warrant should be suppressed. We also hold, however, that while the warrant was overbroad as to the other categories of documents, it was not so facially deficient that Special Agent Coffey could not have reasonably and in good faith believed that it adequately authorized the search he undertook. Suppression of all the other documents is therefore not required by the fourth amendment.

*Affirmed in part, reversed in part and remanded* for proceedings consistent with this opinion.