/s/ Thomas F. Hogan
Thomas F. Hogan
United States District Judge

UNITED STATES of America, Plaintiff,

v.

William BATER, Defendant.

Crim. A. No. 92–10261–WD.

United States District Court,
D. Massachusetts.

April 30, 1993.

As Corrected July 19, 1993.

Brian T. Kelly, U.S. Attorney's Office, Strike Force Div., Criminal, Boston, MA, for U.S.

AnneMarie Hassett, Federal Defender Office, Boston, MA, for defendant.

### MEMORANDUM AND ORDERS

WOODLOCK, District Judge.

The defendant William Bater is charged with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). A Walther PPK 7.65 MM pistol and the ammunition were seized from his home while police were executing a warrant. The defendant moved to suppress these items alternatively on the grounds that the warrant which brought police to their presence was invalid, that the items were not properly in plain view, or that the police did not have probable cause to seize them.

In this case, during a search pursuant to a warrant for stolen property, police officers seized items—a weapon and some ammunition—not described in the warrant. The defendant, now charged with a federal weapons offense independent of the stolen property charges, is seeking to suppress those nondescribed items. After finding the police were properly in a position to view the items, I must confront the ultimate question whether weapons and ammunition are "tools of the trade" for burglars and thus whether, even in the absence of probable cause to believe that such items were used in the offenses to which

the warrant specifically related, they can be seized when they appear in plain view during the search of a putative burglar's premises. Under relevant case law, I conclude that the weapon and ammunition here must be treated as "tools of the trade" and consequently could properly be seized. Accordingly, I will deny the motion to suppress.

## I

### Background

On September 23, 1991, at approximately 10:30 AM, Lisa Hickey of Bridgewater reported to the Middleboro Police Department the theft of her black 1986 Chevrolet Monte Carlo (the "Monte Carlo"). According to Lieutenant Detective Philip Warish of the Taunton Police Department, who received a report of the theft on September 24 from a Middleboro officer, "[a]t the time of the theft a red pickup was seen following it with two black males." *Warish Aff. in Support of Application for Search Warrant ("Warish Aff.")* at 1, *affixed to the Government's Consolidated Response to Defendant's Motions ("Gvt. Res.")*. The affidavit does not say who saw the red pickup. The reported race of the occupants has not been made an issue in these proceedings.

Also on September 23, at approximately 4:05 PM, David Tucker reported a burglary of his home to Middleboro Police Detective Gerald Thayer. Tucker reported stolen a Goldstar microwave, a Mitsubishi TV and VCR, a jewelry box (containing diamond and sapphire jewelry and gold with the markings "750" or "825"), an Apple Computer IIGS with accessories (an Imagewriter Printer, three peripheral disc drives, a keyboard, a monitor, a mouse, and a joystick), two Bose stereo speakers, some silver dollars, and a tan box containing a stamp collection. Tucker was also told, though it is not clear by whom, that a black Monte Carlo and a red pickup had been seen being driven "in a very fast pace" in the neighborhood. *Tr.* at 70 (Tucker), *Warish Aff.* at 1.

On September 24, Massachusetts State Police Trooper Raymond Stevens stopped a Monte Carlo which was identified as the one stolen from Hickey. The driver, Freddy Ma-

tias, was charged with motor vehicle larceny and taken to a Brockton police station.

While at the station, Matias told the police he had gotten the car from "Peter." Questioned about the Tucker burglary, Matias told the police that he did not commit it but that Peter, "Billy," and "Sam" did. Matias apparently knew Billy. He stated that he did not know Billy's last name, but knew where he lived and that he lived there with a wife or girlfriend and two children.

Matias stated that Peter and Sam, driving the Monte Carlo, appeared at a location in Brockton on September 23 at 1:35 PM, and that Billy also appeared there driving a red pickup truck. Matias said further that Peter and Billy told him the cars were stolen, that they had committed a burglary in Middleboro, and that they had taken a TV, a VCR, a computer, and some jewelry.

Matias also said that the stolen goods were divvied up among the thieves, and that the TV and the computer had gone to Billy's house in Taunton. Matias did not see these items in Billy's house. Matias said that Billy told him that Billy had taken his portion of the stolen goods to his house in a third stolen car, a gray Monte Carlo.

Sometime on September 24, Matias accompanied the police to 27 Lawrence Street, where Matias said Billy lived. With the police watching, Matias knocked, and a woman answered the door. Matias reported the ensuing conversation to the police as follows: the woman told Matias she was the babysitter and that Billy was at the hospital with one of his children; when Matias asked her if Billy still had the computer, the woman said yes, and added that he also had the TV.

On September 25, after speaking to Stevens and Thayer, Warish sought a warrant to search 27 Lawrence Street for certain of the stolen items. The application for the warrant and the warrant itself describe the items which were the object of the search as follows:

1. 26″ Mitsubishi TV Model CS–2656R color black

2. Apple Computer Model IIGS and other Apple components including an image writer printer II, 3 separate disc drives

**32**

(2—5½" (sic) + 1—3½") one tan keyboard with monitor, base CPU, joystick, and a hand held computer mouse, Jewelry box with blueberry print design *Application for Search Warrant* and *Search Warrant*, affixed to *Gvt. Res.* The warrant was issued and executed on the same day. Some of the facts regarding communication between the officers preparing the affidavit and applying for the warrant are developed more fully in Section II below.

The police executing the warrant were met at the door by a woman identifying herself as Tina Viola. She told them that she lived there with William and Kimberly Bater and their two children. A male friend of Viola's, Deshawn McLean, was also present.

In the room to the left of the kitchen, which Viola described as hers, the police observed a Mitsubishi TV that was the same model as that missing from the Tucker house. Viola told the police that the defendant had put the TV in her room a "couple days earlier." *October 8, 1991 Incident Report of Warish at 1, affixed as Exhibit A to Defendant's Memorandum in Support of Motion to Suppress ("Def. Mem.").*[1]

The police also entered the front bedroom, which Viola described as belonging to the defendant and Kimberly Bater. They there seized an Apple Computer and accessories, which were set up on the dresser, and a Toshiba TV. Also seized, although not specified in the warrant, were four United States Mint Proof sets, a camera, and a police scanner. In another room in the house, the police seized an AT & T telephone, and from the "dish room," a Goldstar microwave which Viola said had appeared recently.

While in the Baters' bedroom, Taunton Police Officer Joseph Goldrick observed an envelope containing ammunition on the dresser. *Transcript of Hearing, January 15, 1993 ("Tr.")* at 8 (Goldrick) ("[T]he white envelope was opened and I could see a number of rounds of ammunition, some of which were lying just outside of this particular white envelope"). He searched the first drawer of the dresser, and found a loaded

Walther PPK 7.65 MM and more ammunition. The police asked Viola about the gun, and Viola told them "that she had seen Peter with it the day before," *October 1, 1991 Incident Report of Warish at 1, affixed as Exhibit D to Def. Mem.* In response to questions from Warish, both Viola and McLean denied owning the weapon. *Tr.* at 38.

The weapon and the ammunition were seized, in the words of the October 1, 1991 Incident Report, "as no one present was licensed and it was not clear if Bater was." *Id.* Some of the important facts regarding the specific conduct of the officers during the search are below.

## II

### The Validity of the Warrant: The Good Faith Exception

In deciding whether the police have lawfully executed a warrant, a court may bypass a determination with respect to probable cause and proceed directly to the question of whether the police could, in good faith, have relied on the warrant. *United States v. Edwards,* 798 F.2d 686, 690 (4th Cir.1986); *United States v. Maggitt,* 778 F.2d 1029, 1033 (5th Cir.1985), *cert. denied,* 476 U.S. 1184, 106 S.Ct. 2920, 91 L.Ed.2d 548 (1986). This case presents no novel probable cause issues, and I will proceed to a discussion of good faith. As will become apparent, I am of the view that probable cause for a warrant existed. But I discuss the issues in the good faith framework because it is a less demanding standard for the police. For purposes of this section of this memorandum, the only question is whether the police acted in good faith in relying on the warrant to authorize entry into 27 Lawrence Street; I postpone any discussion of whether the police relied in good faith on the inclusion of the Tuckers' jewelry box in the warrant until the discussion in Section III.A.1. below regarding the actual seizure of the weapon and ammunition.

---

1. There are two Incident Reports from Detective Warish in the record, both attached to the Defendant's Memorandum. They are labelled in the bottom right hand corner of the first page. Exhibit A is dated October 8, 1991; Exhibit D is dated one week earlier, October 1, 1991.

"[O]bjectively reasonable reliance on a subsequently invalidated search warrant" will ordinarily not be grounds for suppression. *United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 3420, 82 L.Ed.2d 677 (1984). The Supreme Court has decided that the exclusionary remedy is principally the result of a policy choice aimed at deterring wrongful police conduct in general rather than a mechanism designed to protect specific privacy interests. Given that policy, suppressing evidence seized pursuant to a warrant is normally valueless, since seeking a warrant is the most the police can do to avoid illegality. *Id.* at 920–21, 104 S.Ct. at 3419. There are several limits to the good faith exception to the probable cause requirement; only one is in issue in this case: there is no good faith exception when the police rely on "a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* at 923, 104 S.Ct. at 3421 (citation omitted).

█ The question, then, is whether the police's belief in the warrant's legitimacy was reasonable. I find that it was. The magistrate here plainly did what magistrates should do: he examined the totality of the circumstances in reaching a common-sense conclusion about the probabilities of criminal activity. *Illinois v. Gates,* 462 U.S. 213, 230–239, 103 S.Ct. 2317, 2328–2333, 76 L.Ed.2d 527 (1983). And no reasonable officer would believe that the affidavit here was insufficient to support a magistrate's finding of probable cause. The affidavit contained the following information linking the stolen property to the premises. According to Matias, the defendant had expressly told him that the black Monte Carlo and the red pickup truck were stolen, and that he, Peter and Sam had committed the burglary in Middleboro. Matias also specified some items purportedly taken—a TV, a VCR, a computer, and some jewelry. *Warish Aff.* at 1. The defendant purportedly told Matias that two of the items that had gone to the defendant's house were the Apple Computer and the TV. The affidavit states that Matias did not see these

items in the defendant's house, but it asserts that Matias saw them at the time he met up with Bater and the others in Brockton. *Warish Aff.* at 2 ("It has also been determined that items that were seen by Freddy on 9/23 (TV and computer) and identified by the defendant as being stolen in Middleboro are currently in the second floor apt of 27 Lawrence St.").[2]

The next day Matias and the police went to the defendant's residence; Matias knocked and was greeted by the babysitter. When asked if Billy "still had the computer" the woman answered "that he did and that he also had the TV." *Warish Aff.* at 2. In other words, the woman confirmed that the defendant had the two items that the defendant told Matias were going to the defendant's apartment.

Matias never saw the stolen goods in the apartment, but he had been told by the defendant that stolen goods were there. The defendant does not suggest he himself had any motive to lie to Matias, and it is difficult to conjure one. Thus, the basis of Matias' knowledge—direct admission of criminal activity by the defendant—is sound, even if Matias never observed either the theft or the stolen goods in Billy's apartment.

This affidavit was sufficient. The defendant had, according to Matias, admitted to the crime and described it in some detail; the basis for Matias' knowledge of the crime could hardly have been better. At the suppression hearing, the defendant's attorney elicited testimony to the effect that none of the officers who interviewed Matias had ever worked with him before, suggesting Matias had no track record and the police had no reason to believe him. *See, e.g., Tr.* at 81–82 (Stevens). After *Illinois v. Gates,* such facts are relevant but not decisive. 462 U.S. at 230, 103 S.Ct. at 2328 (effectively overruling old *Spinelli–Aguilar* three prong test in which previously established reliability is a necessary, if not sufficient, condition to support an affidavit).

---

2. The defendant points out that the affidavit says only that the items "were seen" by Matias. *Def. Mem.* at 8; *Warish Aff.* at 2. The defendant states correctly that there is nothing to substantiate the officer's assertion, and the passive construction makes the source of the information unaccountable.

At least one Circuit has explicitly found that, when a magistrate has reason to credit an informant's basis of knowledge, but not his honesty or reliability, the warrant will not necessarily be found so lacking in indicia of probable cause as to bar invocation of the rule in *Leon*. *United States v. Bishop*, 890 F.2d 212, 217 (10th Cir.1989), *cert. denied*, 493 U.S. 1092, 110 S.Ct. 1164, 107 L.Ed.2d 1067 (1990). The situation in *Bishop* is similar to this case. The police, investigating a bank robbery, received an anonymous phone call stating that the robber was living with a woman named Karen. The informant provided Karen's phone number and place of employment; the police were able to trace the number and came up with a residence. Two other witnesses were able to confirm that a man matching the description of the robber was living with Karen. On this basis, a magistrate issued a warrant for Karen's residence. *Id.* at 214.

In *Bishop*, no one except an anonymous caller was able to state that the robber was, in fact, the man living with Karen; only the description matched. The anonymous caller "did not state the basis of his knowledge." *Id.* By contrast, in the instant case, the police knew the name of the informant and the basis of his knowledge. It is true that in *Bishop*, independent of the informant, third parties were able to match the man living with Karen and the description of the robber; in the instant case, however, there were no eyewitnesses to the burglary available to police. Judge Ebel also noted in *Bishop* that "the very nature of the crime charged against this defendant would not necessarily cause an agent here to expect to see continuing suspicious activity." *Id.* In the instant case, the stolen goods were allegedly in Bater's apartment, and there was no reason to believe they were going anywhere immediately.

This Circuit has sometimes looked to the conduct of the police when determining good faith. *United States v. Diaz*, 841 F.2d 1, 6 (1st Cir.1988) (citing *Massachusetts v. Sheppard*, 468 U.S. 981, 989 n. 6, 104 S.Ct. 3424, 3428 n. 6, 82 L.Ed.2d 737 (1984)). In this case, the police did not merely rely on Matias' statements: they had descriptions of cars in the Middleboro burglary from neighbors that coincided with Matias' descriptions of the cars the alleged burglars were driving. And they did make some effort to corroborate Matias' statement: they accompanied him to "Billy's" address, where he knocked, asked for Billy, and talked with the only person who was apparently present in the apartment. Matias was able to confirm that "the computer" was still in the apartment, as well as "the TV."

Finally, the fact that the police never obtained a copy of Matias' extensive criminal record, and did not attach it to the warrant application, does not undermine their good faith. It was apparent to both the police and the magistrate that Matias was a criminal— he was knowingly driving a stolen vehicle, a fact that was in Warish's affidavit. Failure to disclose his criminal record in the warrant application is not sufficient grounds for invalidating the warrant here. As a general proposition, it is recognized that much of the information police and magistrates act on comes from criminals, *see, e.g., United States v. Martin*, 920 F.2d 393, 398–99 (6th Cir. 1991); *United States v. Flagg*, 919 F.2d 499, 501 (8th Cir.1990), and the magistrate was plainly apprised of the informant's criminal propensities in this specific setting. The officer's good faith reliance upon the magistrate's decision was certainly not undermined by this omission.

I hold that the police were entitled to rely on the warrant in this case.

### III

### Seizure of the Weapon and Ammunition: Plain View

 The warrant for the search of 27 Lawrence Street did not identify a weapon or ammunition. To justify seizure of the weapon and ammunition, the prosecution relies principally on the "plain view" exception to the Fourth Amendment's warrant requirement. The "plain view" exception allows police, in the course of searching for warranted items, to seize other items provided 1) they have a right to the vantage point from which they observe the item, and 2) they recognize immediately the incriminating nature of the

item. *Horton v. California*, 496 U.S. 128, 136, 110 S.Ct. 2301, 2308, 110 L.Ed.2d 112 (1990).[3] The second requirement is really the probable cause requirement: the item must, upon discovery, appear to be a fruit, instrumentality, or evidence of a crime. *Arizona v. Hicks*, 480 U.S. 321, 326, 107 S.Ct. 1149, 1153, 94 L.Ed.2d 347 (1987) (probable cause required for seizure pursuant to the plain view exception to the warrant requirement); *United States v. Gianetta*, 909 F.2d 571, 578 (1st Cir.1990).

## A. Vantage Point

The warrant in this case permitted entry to 27 Lawrence Street. But defendant argues that the police did not have a right to the vantage point from which they viewed the weapon in the dresser. If defendant is correct, then I must suppress those items which were improperly seized, while permitting introduction of the rest. *United States v. Diaz*, 841 F.2d at 4.

Bater is charged with possession of both ammunition and a weapon. Some of the ammunition was on top of the dresser, and unquestionably in plain view of Goldrick, who had properly entered the bedroom. *Tr.* at 8 (Goldrick); *see supra*. Whether or not the officers had a right to a vantage point, therefore, is only materially disputed with respect to what was found in the dresser drawer: more ammunition and the weapon.

The government claims a right to its entry into the dresser drawer, and therefore to its vantage point for some of the ammunition and the weapon, on two bases: the officers were searching for the jewelry box, and the officers were still searching for computer components. See *Tr.* at 7 (Goldrick). I ad-

dress each of these in turn, and find that although seizure based on the search for the jewelry box was impermissible, seizure based on the search for computer components was not.

### 1. The Jewelry Box and Reasonable Reliance

The defendant argues that, because Matias explicitly told the police that the jewelry box had gone to Brockton, the police could not rely on the warrant to justify searching for it at 27 Lawrence Street.

The following facts are not disputed, and so lengthy annotation is omitted. Matias told both Thayer and Stevens that the jewelry box had gone to "Peter's" house in Brockton, not to Taunton. Although both Thayer and Stevens told Warish that a jewelry box had been stolen, neither told Warish that Matias had specifically said that it had gone to Brockton, not Taunton. As a result, Warish believed the jewelry box was also at 27 Lawrence Street, the affidavit conveyed as much, and the magistrate issued the warrant accordingly.

One way of addressing this issue is to ask whether the police were deliberately or recklessly concealing information from the magistrate with respect to the jewelry box; if they were, then suppression is appropriate. *Franks v. Delaware*, 438 U.S. 154, 156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978); *see also Leon*, 468 U.S. at 914, 104 S.Ct. at 3416. The concealment arguably arose when Thayer and Stevens told Warish that a jewelry box was stolen but failed to add that Matias had told them it had not gone to 27 Lawrence Street. I do not need to decide the

---

**3.** Before *Horton*, many courts added a third prong, which commanded a plurality in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971): inadvertence of discovery. *Horton* eliminates that prong, on the grounds that a subjective analysis of the police officers' state of mind adds nothing to Fourth Amendment protection. The danger of a "general warrant" is sufficiently mitigated, according to *Horton*, by the fact that the police's vantage points inside a residence are limited by items specified in the warrant, irrespective of the intentions of the officers.

*Horton* may suggest a different third prong: "lawful right of access to the object itself." *Hor-*

*ton*, 496 U.S. at 137, 110 S.Ct. at 2308. It is not clear that this is a generalizable requirement, however. It may arise only from the unique facts in *Coolidge*, in which the cars searched were in plain view, but the police had to trespass unlawfully on private property to get to them. *Id.* This circumstance will ordinarily not arise in the warrant setting. Warrants usually permit entry into a defined premises, within which the objects specified in the warrant limit the police's movements. In theory, the warrant process is designed to ensure that no unexpected, interior property rights are implicated.

difficult question of whether the officers were deliberately or recklessly false when Warish presented his affidavit to the magistrate because a less demanding standard disposes of the issue.

 The issue may be confronted by asking whether the officers were reasonable in their reliance on the warrant once it was issued. I find they were not. As the Supreme Court said in *Leon:*

> ... the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable ... and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued.

*Leon,* 468 U.S. at 922–23, 104 S.Ct. at 3420; *see also Maryland v. Garrison,* 480 U.S. 79, 85, 107 S.Ct. 1013, 1017, 94 L.Ed.2d 72 (1987). Thayer, of course, was one of the main sources for the information in Warish's affidavit. *Tr.* at 122. Thayer was also one of the officers executing the search at 27 Lawrence Street. *Warish Incident Report* (reporting on conduct of search, listing Thayer as one officer present); *Tr.* at 111, 115, 116, 120. Thayer saw the warrant at the time of the search. *Tr.* at 111, 116. Even if Warish had reason to believe the warrant properly authorized a search for the jewelry box, Thayer did not. In fact, the opposite is true: Thayer knew that the jewelry box was not expected to be at 27 Lawrence Street, and that the magistrate was incorrect in believing that it was.

The fact that Thayer was not the affiant does not alter the legal implications of his knowledge. As the Supreme Court said in *Leon:*

> It is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination.

*Leon,* 468 U.S. at 923 n. 24, 104 S.Ct. at 3420 n. 24 (citing *Whiteley v. Warden,* 401 U.S. 560, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971)). Thayer, who both provided the information in the affidavit and joined in the search, did not have an objectively reasonable belief in the validity of the warrant, at least as far as the jewelry box is concerned.[4]

Thayer's unreasonable reliance on the warrant infects the entire search for the jewelry box. With respect to probable cause, the knowledge of officers working together is constructively, even if not actually, shared. *Whiteley v. Warden,* 401 U.S. at 568, 91 S.Ct. at 1037 (1971); *Illinois v. Andreas,* 463 U.S. 765, 771 n. 5, 103 S.Ct. 3319, 3324 n. 5 (1983) ("where law enforcement authorities are cooperating in an investigation, as here, the knowledge of one is presumed shared by all"); *see also Burns v. Loranger,* 907 F.2d 233, 236 n. 7 (1st Cir.1990) (referring to "fellow officer rule"). This often works to the benefit of the police: the knowledge of each officer, taken individually, may be insufficient for probable cause, but collective knowledge may serve as the basis for upholding a warrant. *See, e.g., United States v. Wilson,* 894 F.2d 1245, 1255 (11th Cir.) (collective knowledge constituted probable cause), *cert. denied,* 497 U.S. 1029, 110 S.Ct. 3284, 111 L.Ed.2d 792 (1990). As the facts of *Whiteley* itself make clear, the reverse is also true: when one officer knows that probable cause is lacking, the illegality "cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest." *Whiteley,* 401 U.S. at 568, 91 S.Ct. at 1037; *see also Leon,* 468 U.S. at 923 n. 24, 104 S.Ct. at 3420 n. 24.

Thayer may not, technically, be the instigating officer for the affidavit as drafted, but that circumstance cannot be used as a shield. He supplied the information in the warrant, he was a member of the search party, he knew the warrant was over-broad, and therefore, he could not properly stand mute and let officers who knew less than he did conduct a search for an item he knew was not properly part of the warrant. *Leon* express-

---

4. I note that the inquiry here is purely objective: under "all of the circumstances," would Thayer have known "that the search was illegal despite the magistrate's authorization"? *Leon,* 468 U.S. at 992 n. 23, 104 S.Ct. at 3420 n. 23.

ly invites a court to consider all of the relevant law enforcement agents in determining whether the reliance on the warrant was reasonable. Thayer was in a unique position to know that the warrant was not properly particularized as to the jewelry box, irrespective of the magistrate's determination.

■ Exclusion as a remedy is appropriate only when it will serve to deter wrongful conduct by the state; it is not appropriate when the error committed was the magistrate's. *Leon,* 468 U.S. at 917, 104 S.Ct. at 3417–18; *Gvt. Supp. Mem.* at 6. The wrongful conduct here is Thayer's: by remaining silent, he participated in, and allowed others to participate in, a search for an item as to which he knew there was no probable cause. This is precisely the type of circumstance in which the exclusionary rule would serve its intended purpose. However, another justification for the search of the drawer is available to the police.

### 2. Other Items and the Scope of the Search

An alternative justification for looking inside the drawer is that, at the time they did so, the police were still searching for other items properly contained in the warrant. It is uncontested that the only remaining items that could have fit into the drawer were computer parts.

The parties have provided little guidance on the issue. The defendant states that "Prior to searching the bureau, no officer compared the computer equipment in plain view with that sought in the warrant to determine whether or not any further search was necessary." *Def.Supp.Mem.* at 3. The implication is that, once the computer equipment came into view, the police were obligated to stop the search and inventory the equipment to see if anything was missing. Only if items were missing, presumably, could the search have continued. The government, for its part, states only that "Detective Goldrick testified that he believed he was still proper-

ly searching for small stolen computer equipment, e.g. disks, when he opened the dresser drawer and found the handgun." *Gvt. Supp.Mem.* at 8.

■ The Fourth Amendment prohibits "unreasonable" searches, and courts have generally applied that standard when determining whether the searching officers' conduct violates the amendment. *United States v. Wuagneux,* 683 F.2d 1343, 1352 (11th Cir. 1982) ("the relevant inquiry is whether the search and seizures were reasonable under all the circumstances"), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983); *see also Dalia v. United States,* 441 U.S. 238, 257, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979) ("it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant"). There is no question that, once the police have discovered everything enumerated in the warrant, anything seized thereafter must be suppressed. *Horton,* 496 U.S. at 140, 110 S.Ct. at 2310. But there are no bright line rules governing how and how often officers must communicate with one another while conducting a search, or when they must stop and inventory the items in view before continuing to look. I examine the officers' conduct, therefore, for reasonableness.

When Goldrick and another officer entered the messy bedroom, they spotted a computer and some computer parts. They informed Warish that they had done so. Warish did not, at that point, stop searching, go to the bedroom, and check all visible computer components against the warrant. *Tr.* at 50–52. Goldrick and the other officer, at that point, continued searching for "jewelry items or even components to the computer because there was a lot of things in that particular room at that time." *Tr.* at 7 (Goldrick). This was the search that led Goldrick to open the dresser drawer, and find the weapon and more ammunition. *Tr.* at 8–9.[5]

---

**5.** The testimony at the suppression hearing regarding whether the weapon was in plain view within the drawer, whether Goldrick pushed down on the clothes in the drawer before he lifted them up, etc., is not critical. Some com-

puter components could have been under the clothes; the only question is whether Goldrick was permissibly *still* searching for those components.

The question, then, is this: did the officers, upon seeing a computer and computer components strewn about the room, have the right to continue searching for computer items not immediately in view, or were they obligated to cease opening containers until they had inventoried the visible computer components and determined whether or not they comprised all of the items specified in the warrant? I believe the officers here were acting reasonably in their search.

■ Whether or not it would have been preferable for the officers to inventory what was visible at the time, I cannot say it was unreasonable, while searching for numerous small computer components in a messy room, to open dresser drawers. This is not, of course, a license to conduct a general search: the police may not unreasonably delay inventorying items when they have reason to believe, but do not know, that they may have all or almost all of the items in the warrant. Here, however, there was no unreasonable delay. There was simply a decision by officers who were separate parts of the larger group of executing officers to continue a limited search—confined, as far as the evidence reveals, to the bedroom—for containers which may have held items specified in the warrant. Courts cannot direct the execution of a warrant minute by minute, and no rule requires officers to check all visible items before opening any containers. It would be unreasonable for a court to require that, in every case, the police in a multi-person search team check every item they come across against the warrant as they proceed; the latitude they have to conduct searches is subject to standards, not rules. The search was reasonable under the circumstances.

Finally, testimony at the suppression hearing revealed that Goldrick believed, at the time he opened the drawer, that he was searching for, among other things, computer disks. *Gvt.Supp.Mem.* at 8. Computer disks were not themselves in the search warrant, however, and the defendant argues that Goldrick was not, therefore, permitted to open the drawer. But "it is a bedrock premise of Fourth Amendment jurisprudence that an officer's state of mind or subjective intent is inapposite as long as the circumstances, viewed objectively, justify the action taken." *United States v. Hadfield,* 918 F.2d 987, 993 (1st Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2062, 114 L.Ed.2d 466 (1991); *see also Scott v. United States,* 436 U.S. 128, 137–38, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978). Viewed objectively, Goldrick was still properly searching for computer components specified in the warrant, including components—for example, the joysticks and the external disk drives—small enough to fit in the drawer. The fact, then, that Goldrick said at the hearing that he was searching for disks is not grounds for suppression.

### B. Incriminating Nature of the Ammunition and Weapon

■ The remaining issue, then, is whether the incriminating nature of the weapon and all the ammunition was immediately apparent. By the time it filed its supplemental memorandum, the government was still pressing two basic arguments: [6] first, that no one present at the time of the search was legally able to possess the weapon, making its presence in the apartment a probable violation of the firearm laws; second, that the gun was probably used in the burglary which underlay the warrant.

---

**6.** The United States originally argued that the weapon was admissible under the public safety exception to the warrant requirement. The government understandably declined to pursue this argument after the hearing. The public safety exception permits the police to seize weapons endangering the public, whether or not the police have probable cause. *See New York v. Quarles,* 467 U.S. 649, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (public safety exception to *Miranda* rule); *United States v. McClinnhan,* 660 F.2d 500 (D.C.Cir.1981) (public safety exception to Fourth Amendment requirements). There were, of course, young children living at 27 Lawrence Street. The public safety exception cases, however, are confined to situations in which there is general, public access to dangerous instruments. In the instant case, the weapon was in a dresser drawer in a private apartment. To apply the exception in the instant case would allow the police to seize dangerous items—weapons or prescription medicine, for example—any time the owners of those items were not home but young children were. Concern for the well being of the children is, of course, appropriate, but there are no grounds for asserting that those who own potentially dangerous items risk their seizure whenever they leave the house.

## 1. Possession as a Probable Crime

Possession of a weapon without a license, contrary to defendant's assertion, *Def.Mem.* at 5 [7], is illegal. *See* Mass.Gen.L. ch. 140, § 129C (1981 and Supp.1993); *id.* ch. 269, § 10(h) (1992). Apparently, neither Viola nor McLean claimed ownership of the weapon or possessed a valid F.I.D. card. *Gvt.Res.* at 2.

 The only reasonable inference to be drawn at the time the police conducted the search was that the weapon and ammunition belonged to one (or both) of the Baters. There is no evidence, however, that the police knew, or attempted even to learn, whether either of the Baters possessed a valid F.I.D. card. The fact that the defendant's criminal record may have barred his legal possession of a firearm is irrelevant, because the police did not know the record at the time of the search (they did not even know the defendant's last name). Moreover, there is, as far as the record discloses, no evidence that Kimberly Bater was legally incapable of possessing an F.I.D. card.

The likely owners of the weapon and ammunition, then, were never determined to be illegal possessors, and the police had no adequate reason to believe this was the case. No one claiming to own the weapon was asked to produce an F.I.D. card and failed to do so, in violation of Mass.Gen.L. ch. 140 § 129C(s). Under ordinary circumstances, the government cannot simply seize property, which may be legally possessed, without any reason to believe it is not so, even if that property is a weapon. The regulatory regime for firearms registration does not make weapons and ammunition, standing alone, contraband.

## 2. Possession as Evidence of the Burglary

The government argues that something more than weapons and ammunition standing

alone is at issue here. The government contends that the weapon and ammunition could be viewed as "tools of the trade" for burglars, and therefore could be seized in conjunction with specified objects of the search even though not themselves contained in the warrant.

 The "tools of the trade" rule is essentially an evidentiary shortcut for the second prong of the "plain view" test: some items (not in the warrant), when found during a proper search for other items (in the warrant), are considered by definition incriminating. The "tools of the trade" case law has developed most fully in the context of an association between guns and drugs.[8] In *United States v. Caggiano*, 899 F.2d 99 (1st Cir.1990), a reliable informant twice described the location of narcotics and weapons; the police sought warrants only for the drugs, but seized the firearms during the searches. The defendant was convicted of violating firearms laws. The First Circuit found that

> It is now recognized by us and other circuits that firearms are one of the tools of the trade of drug dealers. Guns, like glassine bags, scales, and cutting equipment are an expected and usual accessory of the narcotics trade.

*Caggiano*, 899 F.2d at 103. The Court went on to observe that "[a]ny reasonably competent police officer who discovered firearms while searching for drugs would be immediately aware of their evidentiary significance." *Id.* at 104. Therefore, officers finding weapons in the possession of narcotics dealers, even when weapons are not their quarry, are entitled to seize them.

The question presented by this case is whether a weapon is a "tool of the trade" when the trade is burglary, and not narcotics trafficking. If it is, then a weapon uncovered during a search for stolen property obtained

---

7. Defendant may be citing to the earlier version of the state's law, which, apparently, referred only to "carrying." *See Commonwealth v. Couture*, 407 Mass. 178, 188, 552 N.E.2d 538 (1990).

8. Possession of burglarious tools is itself an offense. Mass.Gen.L. ch. 266 § 49. The possession of such items would be inherently incriminatory in this context. Observation of such items

during a search for stolen property would presumptively trigger the plain view exception to the traditional warrant requirement. But the government does not contend, nor could it credibly do so, that the weapon and ammunition were burglarious tools within the Massachusetts statutory scheme.

by burglary is presumptively evidence that a crime probably has been or is being committed, and may be seized.

The caselaw concerning the question whether weapons are or are not tools of the burglary trade is not as developed as the drugs and guns caselaw. Yet, there are cases with language suggesting the requisite association between guns and burglary. In *United States v. Hatfield*, 815 F.2d 1068 (6th Cir.1987), the police had probable cause to stop a motorist for driving erratically. The valid stop resulted in a vantage point from which a police scanner was observed. The observation of the scanner, in turn, led to a "full-blown search," which turned up burglary tools, a weapon, and ammunition. The defendant was indicted only for being a felon in possession of a firearm. *Id.* at 1069–70. The court admitted the burglary tools as evidence of knowing possession of the gun; in so doing, it found that "the possession of burglary tools and police scanners in the van was similarly probative of Hatfield's knowledge of the presence of the gun, which could be considered a tool of the burglary trade and useful in protecting ill-gotten booty." *Id.* at 1073. The burglary tools, then, were admitted on a determination that they were relevant to (or probative of) knowing possession of the weapon.

Similarly, the Eighth Circuit, without any extended discussion, suggested an association of guns with stolen property in *United States v. Hughes*, 940 F.2d 1125 (8th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 267, 116 L.Ed.2d 220 (1991). There, during a search for stolen property, police officers observed two items—cocaine and a gun—not listed on the warrant. The Eighth Circuit held that "the incriminatory nature of the gun and cocaine was immediately apparent. Cocaine is contraband, and the officers had probable cause to associate the gun with criminal activity." *Id.* at 1127.

It is, of course, possible to distinguish *Hatfield* and *Hughes*. *Hatfield* turned on the issue of relevance and not probable cause. And it is perhaps arguable that the "criminal activity" the Sixth Circuit associated with the gun in *Hughes* related more to the cocaine than the stolen property. The practical implications of the *Hatfield* and *Hughes* language, however, are more powerful than the legal distinctions which might be drawn from deconstruction of their respective texts. Both cases represent a judicial observation about the probability that guns and burglary or its proceeds are associated. The level of probability of association they identify is sufficient to establish probable cause of an incriminatory character to a gun in that context.

The First Circuit has taken a common sense approach to the definition of probable cause:

> Probable cause to support a plain view seizure requires more than "hunch, guesswork, and cop-on-the-beat intuition," but less than proof beyond a reasonable doubt or a "near certainty" that the item is incriminating. There must be enough facts for a reasonable person to believe that the items in plain view may be contraband or evidence of a crime. "A 'practical, nontechnical' probability that incriminating evidence is involved is all that is required."

*United States v. Giannetta,* 909 F.2d at 579 (citations omitted).

Thus, in approaching the question whether to recognize an association between guns and burglary, it is important to honor the oft repeated and universally embraced adjuration that we may not as judges ignore what we know as men. *See, e.g., United States v. Maze,* 414 U.S. 395, 403 n. 7, 94 S.Ct. 645, 650 n. 7, 38 L.Ed.2d 603 (1974) (Rehnquist, J.); *Ross v. Massachusetts,* 414 U.S. 1080, 1085, 94 S.Ct. 599, 602, 38 L.Ed.2d 486 (1973) (Marshall, J. dissenting from denial of certiorari). Particularly in making the judgments as to reasonableness called for by the Fourth Amendment, the Supreme Court has observed:

> [T]he process does not deal with hard certainties but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same and so are law enforcement officers ... [T]he evidence thus collected must be seen and weighed not in terms of library analysis by schol-

ars, but as those versed in the field of law enforcement.

*United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

The association recognized in the case law between guns and drugs is the product of such common-sense conclusions, and while no doubt less than academically rigorous in its empirical methodology, it is reflective of a settled consensus among the judiciary. *See, e.g., United States v. Armond,* 920 F.2d 480, 482 (7th Cir.1990) (relationship between drugs and guns "well supported by ... observation[ ] garnered from experience on the bench"); *United States v. Bonner,* 874 F.2d 822, 824 (D.C.Cir.1989) (relationship known from "common sense[ ] and bitter experience"); *United States v. Wiener,* 534 F.2d 15, 18 (2d Cir.) (relationship known from "experience on the trial and appellate benches"), *cert. denied,* 429 U.S. 820, 97 S.Ct. 66, 50 L.Ed.2d 80 (1976). These cases are not based on the notion that the police may omit weapons from a warrant application when they have reason to connect the particular suspects, crime, or premises with weapons; rather, they announce a rule that is applicable in all instances in which the police have searched for drugs and found guns. *See, e.g., Jennings v. Rees,* 800 F.2d 72, 73–74 (6th Cir.1986) (no suggestion that police suspected weapons possession).

█ I see no way to distinguish the drug and gun cases from the instant case. A fair reading of the cases effectively places a burglar's weapon squarely in the same category as the weapon of a narcotics dealer. Burglars who stash stolen goods in their homes have the same basic motives for possessing weapons that drug dealers do. First, they are in a dangerous business, and carry firearms to protect themselves. Second, they keep valuable goods in their home—whether for sale or for personal consumption—and need to protect the goods. Of course, many, perhaps most, people keep items they and others consider valuable in their homes, and possession of a weapon cannot be *per se* incriminating for such people. But criminals are at a self-imposed disadvantage: if they are robbed, they can hardly complain to the authorities. Therefore, the presence of pro-

tective weapons in proximity to stolen goods suggests the sort of "self-help" in which burglars engage to protect their goods.

This reasoning arguably renders weapons "tools of the trade" with respect to all crimes involving the holding of property either intrinsically illegal (*e.g.,* narcotics) or illegal under the circumstances (*e.g.,* stolen goods). However, the scope may properly be limited—at least for present purposes—to stolen goods associated with burglary.

Such a limitation is consistent with the association between guns and burglary suggested by the inclusion of burglary in the Armed Career Criminal statute. 18 U.S.C. § 924(e)(2)(B)(ii). Section 924(e) is a sentence enhancement statute for anyone convicted of being a felon in possession of a firearm or ammunition if that person has committed a certain number of "violent felon[ies]" or "serious drug offense[s]." One of the enumerated violent felonies is burglary. In discussing burglary's inclusion in the statute, the Supreme Court said:

> The legislative history also indicates that Congress singled out burglary (as opposed to other frequently committed property crimes such as larceny and auto theft) for inclusion in the predicate offenses, both in 1984 and 1986, because of its inherent potential for harm to persons. The fact that an offender enters a building to commit a crime often creates the possibility of violent confrontation between the offender and the occupant, caretaker, or some other person who comes to investigate. And the offender's own awareness of this possibility may mean that he is prepared to use violence if necessary to carry out his plans or to escape.

*Taylor v. United States,* 495 U.S. 575, 588, 110 S.Ct. 2143, 2152–53, 109 L.Ed.2d 607 (1990). In short, Congress has identified burglary—but not necessarily larceny or auto theft—as a property crime pregnant with the possibility of becoming a personal and violent one through its association with firearms.

Of course, § 924(e) is not strictly speaking directed at the association of weapons with burglary. Rather, at its core the statute represents a finding that the predicate crimes often endanger people (as opposed to property) and is a determination by Congress to discourage those who have commit-

ted such crimes from owning weapons, presumably out of a fear that this class of former felons will use weapons while committing other violent crimes and that felons with records including such crimes must be specially and severely sanctioned for possessing firearms. In order to enact this statute Congress need not have believed that these crimes are categorically associated with weapons, but only that criminals whose careers include such offenses are too dangerous to carry weapons. Yet the association which the statute implies between guns and burglary is too strong to be overlooked in forming a practical judgment about probable cause.

■ In short, the association between guns and burglary is no less compelling than that between guns and drugs. Belief in that association found voice in the testimony of the experienced police officers who testified at the hearing, *see, e.g., Tr.* at 11 (Goldrick), 40 (Warish), and 59 (Thayer), and is corroborated by judicial experience. It finds expression in the congressional determination to classify burglary as a species of property offense which is a crime of violence. Under the circumstances, I conclude that a police officer searching for evidence of a burglary, who applies a practical nontechnical brand of common sense, would immediately recognize the incriminating nature of a gun and ammunition observed during the search. Whether a trial judge would necessarily admit the gun at a burglary trial depends upon the particular interplay among Fed.R.Evid. 401, 403 and 404(b) which the trial context presents, but that there is a reasonable basis for believing the gun and ammunition are evidence of a crime is fully justified by the informed practicalities of law enforcement experience. Under the circumstances, the gun and ammunition were properly seized when they came into plain view.

### IV

### Conclusion

For the reasons set forth more fully above the defendant's motion to suppress is hereby DENIED.